**JOHNSON CONTROLS WORLD SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 98–626C, 99–73C.**

United States Court of Federal Claims.

Jan. 26, 2001.

*Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984).

**24.** This decision moots plaintiffs' request for class certification.

Michael S. Giannotto, Washington, DC, for plaintiff. Howard R. Rubin, Shea & Gardner, and Paul E. Pompeo, Johnson Controls World Services, Cape Canaveral, FL, of counsel.

Elizabeth M. Hosford, Washington, DC, with whom was Assistant Attorney General David W. Ogden, for defendant.

## OPINION

MILLER, Judge.

Plaintiff agreed to provide maintenance services at the Department of the Air Force's (the "Air Force") Eastern Test Range (the "ETR") project under Contract No. F08606–84–C–0001 (the "1984 ETR Contract") and obtained insurance for the project under the National Defense Projects Rating Program (the "NDPRP"). Defendant agreed to reimburse plaintiff for NDPRP insurance costs, pursuant to certain limitations. In these

consolidated cases, plaintiff seeks approximately $16 million in damages resulting from the alleged failure of the Government to provide this reimbursement under the 1984 ETR Contract. The vast majority of the costs sought in these cases represent insurance premiums plaintiff paid to its insurer between 1991 and 1998 for workers' compensation, general liability and automobile liability coverage pursuant to NDPRP.

This case is before the court after argument on cross-motions for summary judgment. The issues to be decided are: 1) whether the provisions of Defense Acquisition Regulation (DAR) § 7–203.3, Limitation of Cost,[1] preclude plaintiff from recovering the costs sought for reimbursement, and 2) whether any of the insurance costs for which plaintiff seeks reimbursement are barred by operation of a contract modification to a prior ETR contract that ostensibly covered all claims under the 1984 ETR Contract.[2]

## FACTS

The contract under which reimbursement is sought is one among a longstanding series of contracts awarded by the Air Force for the performance of services on the ETR dating back to 1953. After numerous business reorganizations, name changes, and asset transfers, Johnson Controls World Services, Inc. ("plaintiff"), succeeded Pan American World Airways, Inc. ("Airways"); Pan Am World Services, Inc. ("PAWS"); and Pan Am Corporation under Contract No. F08606–78–C–0004 (the "1978 ETR Contract") and the 1984 ETR Contract.[3]

The parties filed Joint Stipulations of Facts on July 14, 2000 ("Joint Stip."), which recites, with certain minor modifications, the following relevant facts pertaining to the ETR contracts and the operation of NDPRP insurance. The court acknowledges the parties' considerable efforts in this regard and extends its appreciation.

In 1953 the Air Force awarded a contract to Airways to engineer, operate, and maintain the ETR. RCA, as principal subcontractor, operated the instrumentation. One of the ETR contracts was Contract No. F08606–72–C–0030 (the "1972 ETR Contract"), which was awarded to Airways on or about June 14, 1972. The performance period for this contract commenced on September 1, 1972, and ended on September 30, 1977. The 1972 ETR Contract was a cost-plus-incentive-fee ("CPIF") contract. Costs of NDPRP insurance were an out-of-target cost. This contract was closed out in 1982. The ETR contract that succeeded the 1972 ETR Contract was the 1978 ETR Contract. As initially awarded, it provided for services and operations for a base year (FY 1978), plus options to extend for an additional four years (FYs 1979 through 1982). On May 19, 1982, in Modification P00250, the 1978 ETR

1. On September 19, 1983, a joint document issued by the General Services Administration, the Department of Defense and the National Aeronautics and Space Administration established a new Federal Acquisition Regulation (FAR) in title 48 of the Code of Federal Regulations. The FAR system replaced both the Federal Procurement Regulations System for civilian contracts and the DAR for defense contracts. Notwithstanding this change, the DAR provision in the 1972 ETR Contract remains in full force and effect.

2. Defendant raised an additional issue that it claims "arose during the course of discovery in this case: Whether plaintiff possessed NDPRP coverage for the ETR contract for the 40th and 41st demands for reimbursement of preliminary settlements owed to the insurer." Def.'s Br. filed Oct. 20, 2000, at 2. Defendant conceded this issue at oral argument. *See* Transcript of Proceedings, *Johnson Controls World Servs., Inc. v. United States*, Nos. 98–626C & 99–73C, at 6, —— Fed.Cl. ——, —— (Fed.Cl. Jan. 12, 2001).

The parties raised a fourth issue in the Joint Preliminary Status Report filed on June 11, 1999: "Whether the applicability of the NDPRP program carried forward from one contract to follow-on contracts when the contractor changed from Pan American World Airways, Inc. to Pan Am World Services, Inc." In accord with this court's decision in *Johnson Controls World Servs., Inc. v. United States*, 44 Fed.Cl. 334, 344 (1999), defendant acknowledges that Johnson Controls World Services "is not barred from reimbursement for NDPRP insurance premiums, to the extent their computation takes into account claims arising before the date [Pan Am World Services] became the contractor under the 1978 ETR Contract ...." Def.'s Br. filed Oct. 20, 2000, at 7.

3. Johnson Controls, Inc., purchased the assets of PAWS on May 5, 1989. In January 1991, PAWS changed its name to Johnson Controls World Services, Inc. The term "plaintiff" refers collectively to plaintiff and its predecessors.

Contract was modified to extend the term of the contract through fiscal year 1983. The Air Force awarded the 1978 ETR Contract to Airways on September 19, 1977. The performance period for the 1978 ETR Contract commenced on October 1, 1977, and was completed on or about September 30, 1983. For fiscal years 1978, 1979 and 1980, the 1978 ETR Contract was CPIF. For fiscal years 1981, 1982 and 1983, the contract was fixed-price-incentive-fee with cost reimbursable items. NDPRP insurance costs were a cost-reimbursable item. The 1978 ETR Contract has not been closed out.

The performance period for the 1984 ETR Contract commenced October 1, 1983, and was completed on or about October 7, 1988. The 1984 ETR Contract required PAWS to maintain workers' compensation, employer's liability, general liability and automobile liability insurance with respect to its work and the work of its subcontractor. At the time the 1984 ETR Contract was awarded, the DAR made use of NDPRP mandatory for contracts which met the use and eligibility requirements of DAR 10–603.

### 1. *The NDPRP*

The NDPRP is a retrospective-rating insurance plan designed to apply on an overall basis to eligible defense projects from inception to cancellation or expiration. The program provides coverage for workers' compensation, general liability, automobile liability and employer's liability claims asserted against the contractor and subcontractors at projects insured under the Plan. The United States established the NDPRP in 1951 to minimize the cost to the Government of purchasing workers' compensation and liability insurance for defense projects. The NDPRP was an outgrowth of insurance programs that existed during World War II and provides for the wholesaling of automobile liability, general liability, and workers' compensation insurance in a retrospectively-rated package to eligible defense contractors. The NDPRP is designed to utilize the services and organizations of the insurance industry, at a minimum cost to the Government, for safety engineering and handling of claims arising out of eligible defense contracts. Ordinarily, a retrospective-rating plan will result in the lowest net cost for workers' compensation insurance. The NDPRP is intended to provide this insurance to an eligible contractor at even lower costs. Policies issued under the NDPRP are for a term of one year, but provide for automatic renewal at each anniversary date unless notice of unwillingness to renew is served. Endorsements are attached to all renewal policies to tie renewals together and make the NDPRP applicable on an overall basis from inception to cancellation or expiration of the plan.

Under the NDPRP the insured pays a "deposit premium" at periodic intervals during the policy year. This deposit premium is a percentage of the "standard premium" established under the plan, which is based on rates specified or referenced in the plan, and is designed to approximate the expected losses that will be incurred during the policy year. After the policy year is over, the deposit premiums already paid are adjusted upward or downward, depending on incurred losses. These annual retrospective adjustments are referred to as "preliminary settlements of premium." The NDPRP is also subject to a "maximum premium," which is based on rates specified or referred to under the NDPRP Plan. The insurer bears the costs for that amount of the premium which exceeds the "maximum premium." When the NDPRP plan is incorporated into a contract, the maximum premium provides a limit on the insured's (and the Government's) liability for insurance costs.

The annual preliminary settlement process requires the insurer to compute the true premium owing under the plan. The NDPRP sets forth the "formula" for computing this premium—which has been referred to in this litigation as the "indicated retrospective premium." The formula requires a computation of "modified losses" (to which are added a fixed charge, allocated claim expenses, and special assessments, if any, all multiplied by an appropriate tax multiplier). Modified losses are incurred losses multiplied by 1.12. Incurred losses are the sum of all losses actually paid by the insurer plus reserves (indemnity and medical) for unpaid

losses, plus actual hospital and medical expenses. The indicated retrospective premium computed in connection with a preliminary settlement is compared to the figure calculated to be the maximum premium. The lesser of the two figures is used to calculate the premium for the policy year in question, as explained below.

In order to compute incurred losses for purposes of an annual preliminary settlement of premium, reserves are set as of a specific valuation date for open claims and represent the insurer's estimate, as of that date, of the cost of resolving those claims. No reserves are set on closed claims. In connection with computation of the 34th through 41st NDPRP preliminary settlements for ETR at issue in this case, reserves were valued as of the date six months following the close of the applicable policy year. Thus, for instance, for purposes of the 34th preliminary settlement, which is applicable to the policy year October 1, 1987, through September 30, 1988, reserves were valued as of March 31, 1989.[4] Loss reserves are the insurance company's estimate of what the future projected costs will be of open workers' compensation claims. Insurance companies routinely estimate loss reserves for workers' compensation claims.

The value of reserves on a claim that is open for more than one policy period can change from year to year, depending on the estimate to resolve the claim on a given valuation date. Under the NDPRP, each preliminary settlement of premium is calculated on a cumulative basis from the start of the project, so that, in determining the indicated retrospective premium for a particular preliminary settlement, all losses incurred since the inception of the project until the date of the settlement are taken into account. Thus, the premium is in effect a cumulative policy premium based on all incurred losses

since 1954 when the program first applied to the ETR.

After the NDPRP is terminated, a final settlement of premium occurs. This final settlement of premium is based on all losses that have been incurred since the inception of the project. In determining the amount to be billed to (or to be credited to) the insured for each policy year or at final settlement, the insurer first compares the cumulative indicated retrospective premium arrived at in the preliminary settlement (or final settlement) of concern with the maximum premium. The lesser of these figures is then compared to the cumulative amounts previously paid by the insured under the program, and the difference is the amount owing to (or credited by) the insurer. The insured is then reimbursed by (or credits) the Government. Computation of preliminary settlements can continue after performance of work ends under a contract. Under the NDPRP "[f]inal settlement of premium under the Plan shall be made within twenty (20) months after termination of the insurance based upon a determination of loss reserves made not earlier than eighteen (18) months after such termination, but such final settlement may be deferred by mutual agreement for a further period not exceeding twenty-four (24) months." *See supra.* note 4.

### 2. *Airways/PAWS/JCWS and NDPRP*

ETR initially became subject to the NDPRP program in 1954. The ETR contracts remained subject to the NDPRP until September 30, 1995, when JCWS' involvement in the NDPRP program ended. The NDPRP policy endorsements secured by Airways and the successor ETR contractors generally covered a one-year period. From 1976 to 1995, that period ran from October 1 to September 30. Between 1954 and 1995, other eligible contracts (involving sites and

4. The 34th through 41st NDPRP preliminary settlements were effectuated pursuant to the 1984 ETR Contract. The 35th preliminary settlement applied to the policy year from October 1, 1988, through September 30, 1989. The 36th preliminary settlement applied to the policy year from October 1, 1989, through September 30, 1990. The 37th preliminary settlement applied to the policy year from October 1, 1990, through September 30, 1991. The 38th preliminary settlement applied to the policy year from October 1, 1991, through September 30, 1992. The 39th preliminary settlement applied to the policy year from October 1, 1992, through September 30, 1993. The 40th preliminary settlement applied to the policy year from October 1, 1993, through September 30, 1994. The 41st preliminary settlement applied to the policy year from October 1, 1994, through September 30, 1995.

work other than the ETR) awarded by the United States to JCWS, PAWS or Airways became part of the NDPRP program in which ETR participated. *See supra* note 4.

There were 41 preliminary settlements computed for ETR, each based on cumulative incurred losses since 1954. Prior to 1991 each preliminary settlement for ETR computed by the insurer and provided to the contractor included various forms that listed or summarized the following information: (1) all claims made since 1954 that were open as of the preliminary settlement valuation date; (2) all claims that were closed during the policy year in question; (3) all claims that had been closed prior to the policy year in question but on which some further action was taken during the policy year; (4) the accident date for each listed claim; and (5) the total incurred losses dating back to the accident date for each listed claim. For preliminary settlements computed after 1991, these same data were provided in the preliminary settlements computed by the insurer and provided to the contractor, but in a different format. All of the ETR preliminary settlements prepared by the insurer and provided to the contractor since the start of the program in 1954 also contained a worksheet that showed the cumulative computation of the indicated retrospective premium based on losses since 1954, the cumulative computation as of the previous preliminary settlement, and the amount owing by (or to be credited to) the insured. This last amount was the difference between the cumulative indicated retrospective premium computed with respect to the current preliminary settlement less the sum of the cumulative indicated retrospective premium for the previous year and the amounts paid as deposit premiums in the current year.

For five of the six policy years preceding the 34th NDPRP preliminary settlement, the preliminary settlement for ETR, relating to both the contractor and its subcontractor combined, resulted in a credit by the insurer to the ETR contractor, rather than additional monies being owed by the ETR contractor to the insurer. For most of the fiscal years in issue, plaintiff duly forwarded its preliminary settlement of premiums relating to the ETR.

### 3. *Closeout of the 1972 ETR Contract and bidding on the 1978 ETR Contract*

Under cover of letter dated March 1976, from Charles Gilbert of Airways to Contracting Officer William Yearty, Airways responded to issues raised at a February 27, 1976 Industry/Air Force ETR Conference. In that response Airways stated that "[i]t is clear in the event another contractor (or contractors) [other than Airways] should be selected for award of [a follow-on contract] for the present Range Contract functions, that the Government will be obligated for significant costs to be incurred by Pan Am and RCA resulting from their close-outs." A number of costs were then listed, including "severance pay," "[t]ermination of the National Defense Projects Rating Plan and the Defense Department Group Insurance Plan, pension plans, relocation expenses, vacation accruals, and other phase-out expenses."

By letter dated December 13, 1976, Mr. Capley, Airways' Manager, Contracts and Legal, wrote to Contracting Officer Don Cox regarding the subject of "close-out costs" for the 1972 ETR Contract. The letter states that "Government policy requires that [Airways] accumulate all identifiable costs applicable to close-out of [the 1972 ETR] contract which will result from non-renewal [of the contract]," including "those necessary to assure full funding as of 30 September 1977 of the Defense Department Group Term Insurance Rating Plan, National Defense Projects Rating Plan, Contributory Retirement Income Plan, vacation accrual and other similar costs which have been carried forward on an annual basis under contract renewals." In a letter dated January 12, 1977, Contracting Officer Cox concurred that "all costs of the [1972 ETR] contract should be accumulated for close-out under the current contract."

Airways submitted Contract Change Proposal ("CCP") 77–37 on June 10, 1977, in response to Contracting Officer Alex Brown's May 9, 1977 request that Airways inform the contracting officer of the costs that Airways anticipated incurring to close out the 1972 ETR Contract. CCP 77–37 proposed esti-

mated close-out costs as of September 30, 1977, for the 1972 ETR Contract. The costs listed in CCP 77–37 were "[b]ased on assumptions contained in [Contracting Officer Brown's] letter dated 9 May 1977 [on the] subject [of] Close–Out Costs." CCP 77–37 proposed $500,000.00 as "estimated additional needs" for NDPRP workers' compensation and general liability insurance costs for Airways, and $50,000.00 as "estimated additional needs" for NDPRP workers' compensation and general liability insurance costs for the subcontractor, RCA, as of September 30, 1977. CCP 77–37 also included entries for vacation accruals, severance pay, storage and maintenance costs, and "pending litigation—legal fees."

The Air Force and Airways held negotiations at Patrick Air Force Base on August 16, 23 and 24, 1977, covering CCP 77–37. By that time Airways had learned that it would be awarded the follow-on ETR contract. The negotiations covering CCP 77–37 resulted in Modification P00333 to the 1972 ETR Contract. A copy of Modification P00333 was sent to Airways on August 30, 1977, and returned signed by Mr. Capley on September 8, 1977. When Modification P00333 went into effect on September 23, 1977, Airways already had been awarded the 1978 ETR Contract. Modification P00333 obligated $2.8 million in additional funds to the 1972 ETR Contract as close-out costs for fiscal year 1977. Modification P00333 listed the close-out costs as out-of-target costs and stated that "the term 'estimated cost' as used in [the 1972 ETR] contract includes 'target costs' and 'out-of-target costs.'" Among the funds obligated pursuant to Modification P00333 was $550,000.00 for estimated close-out costs under the 1972 ETR Contract for NDPRP insurance.

4. *Billing and payment of NDPRP costs at issue*

The insurer computed, and billed or credited JCWS and its subcontractor for the costs

of, each of the 34th through 41st NDPRP preliminary settlements of premium after October 1988. In turn, JCWS reimbursed, or was credited by, the insurer for the costs of each of the 34rd through 41st NDPRP preliminary settlements of premium. JCWS has also reimbursed its subcontractor for the costs the subcontractor paid to the insurer.

On December 12, 1991, JCWS submitted a certified claim pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–612 (Supp. IV 1998) (the "CDA"), to the contracting officer seeking payment of $4,139,901.48 (the "1991 CDA claim"). This sum represented a portion of the NDPRP costs relating to ETR paid by JCWS for the 34th through 36th preliminary settlements of premium, plus applicable general and administrative expenses.[5] On October 18, 1993, JCWS submitted a certified CDA claim to the contracting officer seeking payment under the 1984 ETR Contract of the $3,456,763.02 sought by PV 89–277 and PV 89–278R,[6] plus interest under the CDA and interest pursuant to the Prompt Payment Act, 31 U.S.C. §§ 3901–3907 (Supp. IV 1998) (the "PPA"), in the amount of $636,796.43, for a total of $4,093,559.45. The contracting officer never rendered a final decision on this 1993 CDA claim (the "1993 CDA claim").

On August 4, 1998, JCWS submitted a claim to the contracting officer under the 1984 ETR Contract PV 89–289 in the amount of $8,378,978.78, representing costs for the 39th through 41st preliminary settlements under the NDPRP program relating to ETR, plus the amount that had been withheld from PV 89–276 for the 34th through 36th preliminary settlements under the voluntary disallowance not conceded, as well as applicable general and administrative expenses. PV 89–289 also included a credit in the amount of $25,062.91 for the 38th preliminary settle-

---

**5.** JCWS deferred invoicing a portion of the costs of the 34th through 36th NDPRP preliminary settlements under a voluntary disallowance not conceded in the amount of $2,607,179.69, which was equal to amounts the Government claimed to have been overbilled by JCWS under the 1984 ETR Contract in connection with the funding of pensions.

**6.** The parties do not identify the basis for the amounts sought in PV 89–277 and PV–89–278R, but do agree that these amounts make up part of plaintiff's claim for reimbursement.

ment. On September 25, 1998, JCWS submitted a certified CDA claim for the $8,432,045.65 sought by PV 89–289 (the "1998 CDA claim"), plus CDA and PPA interest. The contracting officer never rendered a final decision on this CDA claim.

The Government has not reimbursed JCWS for the costs of the 34th through 38th or the 40th through 41st NDPRP preliminary settlements of premium that relate to ETR and has not accepted the credit vouchered in connection with the 39th preliminary settlement.

Plaintiff filed its complaint with this court on July 31, 1998, seeking repayment per the 1991 and 1993 CDA claims. The court bifurcated the liability and damages portions of this case, and plaintiff thereafter moved for summary judgment.

## DISCUSSION

### 1. *Contract interpretation*

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c). Having cross-moved, each party bears the burden of demonstrating entitlement to judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The parties' cross-motions involve issues of contract interpretation, which are particularly well-suited for resolution by summary judgment. *See, e.g., Textron Defense Sys. v. Widnall*, 143 F.3d 1465, 1468 (Fed.Cir.1998).

### 2. *Limitation of Cost Clause*

The parties agree that plaintiff's right to recover under a Limitation of Cost Clause ("LOCC") is an issue appropriate for resolution by summary judgment. The purpose of a LOCC is to "protect both the contractor and the government" from unfunded overruns. *Advanced Materials, Inc. v. Perry*, 108 F.3d 307, 310 (Fed.Cir.1997). The LOCC in this case, DAR § 7–203.3, provides, in pertinent part:

[I]f, at any time, the Contractor has reason to believe that the total cost ... for performance of this contract ... will be greater or substantially less than the then estimated cost hereof, the Contractor shall notify the Contracting Officer in writing to that effect, giving his revised estimate of such total cost for the performance of th[e] contract.

... [T]he Government shall not be obligated to reimburse the Contractor for costs incurred in excess of the estimated cost set forth in the Schedule, and the Contractor shall not be obligated to continue performance under the contract ... or otherwise to incur costs in excess of the estimated cost ... unless and until the Contracting Officer shall have notified the Contractor in writing that such estimated cost has been increased and shall have specified in such notice a revised estimated cost ....

Both parties acknowledge that the LOCC applies to the 1984 ETR contract, that NDPRP premiums were subject to the LOCC, and that the NDPRP costs exceeded the total estimated reimbursable costs set pursuant to the 1984 ETR Contract. *See* Pl.'s Br. filed July 28, 2000, at 35–36; Def.'s Br. filed Oct. 20, 2000, at 8–9; Joint Stip. ¶¶ 126–129, 141. Plaintiff also asks this court to assume, for the purposes of this motion, that it did not provide the contracting officer with the written cost overrun notice, at least for fiscal year 1988.[7] The issue before the court, then, is whether the LOCC should be applied to preclude plaintiff from recovering NDPRP costs.

Decisional law teaches that the LOCC must be applied in light of its purpose of protecting the Government and the contractor from unfunded overruns and that the LOCC does not apply if: (1) the contractor "could not have reasonably foreseen the cost overrun during the time of performance of the contract," *RMI, Inc. v. United States*, 800 F.2d 246, 248 (Fed.Cir.1986); (2) the costs were not avoidable by the contractor through stoppage of work, *see Northrop Grumman Corp. v. United States*, 42 Fed.Cl. 1, 12 (1998) ("A critical factor in the analysis

---

**7.** Plaintiff notes, however, that the parties dispute whether such a notification was given.

of clauses limiting liability is the ability of the contractor to cease performance ...."); (3) the Government was not prejudiced by lack of notice of the potential overrun, *see Dames & Moore,* 93–1 BCA ¶ 25,487, at 126,-976, 1992 WL 310239; (4) the contracting officer "effectively exercised his discretion in favor of allowing overrun costs to the contractor," *General Elec. Co. v. United States,* 188 Ct.Cl. 620, 623, 412 F.2d 1215, 1217 (1969) *("General Elec. I");* or (5) under all the circumstances, "it would be inequitable for the Government to refuse additional funding," *General Elec. Co. v. United States,* 194 Ct.Cl. 678, 684, 440 F.2d 420, 423 (1971) *("General Elec. II").* Plaintiff asserts that all, or at the very least one, of these exceptions should apply to prevent application of the LOCC to the NDPRP reimbursements. Defendant maintains that none of the grounds applies and urges its interpretation of the LOCC to preclude payment to plaintiff. The court addresses each ground separately.

### 1) *Were the cost overruns reasonably foreseeable during the time of performance?*

■ Plaintiff must discharge the burden of proving that the "cost overrun was not reasonably foreseeable" *RMI,* 800 F.2d at 248, and this showing is the "only" one that plaintiff must make. *Id.; see also Titan Corp. v. West,* 129 F.3d 1479, 1481 (Fed.Cir.1997). This requires plaintiff to show that "it was impossible for the contractor to know the status of its actual costs." *Appeal of Planar Corp.,* 77–1 BCA ¶ 12,269, at 59,065, 1976 WL 2049. Plaintiff focuses on the timing of the required LOCC notice to argue that cost overruns were not foreseeable.

A brief discussion of how the NDPRP premiums were calculated provides a needed background to the parties' arguments. The parties have stipulated to this explanation, which is set forth in more detail *supra* pp. 482–84.

Under the NDPRP the insured pays a "deposit premium" at periodic intervals during the policy year. This deposit premium is a percentage of the "standard premium" established under the plan, which is based on rates specified or referenced in the plan, and is designed to approximate the expected losses that will be incurred during the policy year. After the policy year ends, the deposit premiums already paid are adjusted upward or downward, depending on incurred losses. These annual retrospective adjustments are referred to as "preliminary settlements of premium." The NDPRP is also subject to a "maximum premium," which is based on rates specified or referred to under the NDPRP Plan. Under the NDPRP, the insurer bears the costs for that amount of the premium which exceeds the "maximum premium." Where the NDPRP Plan is incorporated into a contract, the maximum premium provides a limit on the insured's (and the Government's) liability for insurance costs.

The NDPRP is a retrospective-rating insurance plan. The annual preliminary settlement process requires the insurer to compute the true premium owing under the plan. The NDPRP sets forth the "formula" for computing this premium—which has been referred to in this litigation as the "indicated retrospective premium." The indicated retrospective premium computed in connection with a preliminary settlement is compared to the figure calculated to be the maximum premium. The lesser of the two figures is used to calculate the premium for the policy year in question.

In order to compute incurred losses for purposes of an annual preliminary settlement of premium, reserves are set which represent the insurer's estimate of the cost of resolving those claims. The value of reserves on a claim that is open for more than one policy period can change from year to year, depending on the estimate to resolve the claim on a given valuation date. Under the NDPRP each preliminary settlement of premium is calculated on a cumulative basis from the start of the project, so that in determining the indicated retrospective premium for a particular preliminary settlement, all losses incurred since the inception of the project until the date of the settlement are taken into account. Thus, the premium is in effect a cumulative program based on all losses since 1954 when the NDPRP was first applied to the ETR.

In determining the amount to be billed to (or to be credited to) plaintiff for each policy year or at final settlement, the insurer first compares the cumulative indicated retrospective premium arrived at in the preliminary settlement with the maximum premium. The lesser of these figures is then compared to the cumulative amounts previously paid by plaintiff under the program, and the difference is the amount owing to (or credited by) the insurer. Plaintiff is then reimbursed by (or credits) the Government.

Under plaintiff's view the cost overruns were not foreseeable before October 1988 after work under the 1984 ETR Contract ended. Plaintiff points out that during the first two years after the 1984 ETR Contract ended (1987–88 and 1988–89), losses attributable to new claims had more than doubled and losses attributable to pre–1987 claims had increased tremendously over prior years. Plaintiff argues compellingly that, when the costs of current and future claims under the NDPRP were viewed in October 1988, plaintiff could not have reasonably foreseen that the losses attributable to new claims would more than double and that already existing claims losses would increase over prior years.

Defendant counters that plaintiff did have notice that its claims costs would be higher than plaintiff had planned for. Defendant points to a letter dated July 2, 1980 ("the 1980 letter"), from United States Aviation Insurance Group ("USAIG"), the insurance company which underwrote the NDPRP insurance policies issued to plaintiff, addressed to Frank B. Hall & Co., plaintiff's insurance broker, which forwarded it to plaintiff. Defendant relies on the 1980 letter to argue that plaintiff knew that its estimates of losses—and therefore its premium rates—were too low, but chose instead to "defer foreseeable costs beyond the end of the contract performance period." Def.'s Br. filed Oct. 20, 2000, at 11.

The 1980 letter stated that the rates plaintiff used for most of its employees were not well correlated to "[b]enefits payable in states insured under the plan . . . ." The letter also suggested that a better approach would be "premium development based on specific craft rates according to the actual exposures present." These rates would "provide a standard premium about 66% higher than at present and adequate to establish a viable maximum." Defendant offers this letter as evidence of plaintiff's knowledge that its premium rates were too low.

Plaintiff responds with a nuanced, but convincing, argument that relies on the manner in which the NDPRP operated. According to plaintiff, if the standard premiums were too low (as defendant suggests), then the deposit premiums (which were paid throughout the year as a percentage of the standard premium) would be too low to satisfy the actual claims for that year. However, the insurer would have reconciled these allegedly inadequate deposit premiums at the end of each fiscal year when the actual, retrospective premium were calculated, "with the result that the deposit premiums and the retrospective premium combined would in fact 'cover' all losses." Pl.'s Br. filed Nov. 17, 2000, at 16. According to plaintiff, "[i]t would have made no difference if deposit premiums had been increased . . . during these years . . . because, following the end of the year, *all* of that excess would have been credited to [plaintiff] (and ultimately, the [G]overnment) when the retrospective premium was calculated." *Id.* at 16–17. Thus, plaintiff argues that the notice imputed in the 1980 letter is irrelevant for purposes of establishing whether the cost overruns were reasonably foreseeable.

The court is mindful of the fact that the LOCC specifically includes NDPRP premiums and that it is "important that the requirements of the cost limitation provision be followed." *Advanced Materials*, 108 F.3d at 310. However, even this admonition from the Federal Circuit carries with it an implicit recognition that limits apply to the enforcement of a LOCC. The lack of foreseeability of the future cost overruns in this case manifests one such limit. *See id.* at 310–11 ("[T]he thrust of the cost limitation is prospective, *i.e.*, the parties are to determine their future course of dealing before the estimated cost has been exceeded and, if performance is to continue, to set the amount of the additional cost.").

From 1980 to 1988, plaintiff was not in a position reasonably to foresee that costs relating to then-existing or future claims would increase so dramatically. Indeed, for five of the six years preceding the 34th NDPRP settlement, the deposit premiums actually overstated the amount of premium due, in some cases by hundreds of thousands of dollars.[8] *See* Joint Stip. ¶¶ 67–68. Given this fact, even the "warning" in the 1980 letter, *see* Def.'s Br. filed Dec. 1, 2000, at 4, would not be sufficient to allow a contractor reasonably to foresee that its claims losses would increase so dramatically. A contractor reasonably cannot be expected to foresee these types of cost overruns which, by their very nature,[9] may be subject to wide fluctuations after termination of performance. The LOCC does not require "clairvoyance." *ARINC Research Corp.,* 72–2 BCA ¶ 9721, at 45,407, 1972 WL 1426. Furthermore, as plaintiff has ably demonstrated, the 1980 letter would have had no effect on plaintiff's ability to foresee its future cost overruns.

Plaintiff points out that the 1980 letter was written from the underwriting company, USAIG, to plaintiff's insurance broker and that the substance of the letter dealt with USAIG's concern about USAIG's liability under the NDPRP. Specifically, USAIG indicated that if the standard premium was too low, then the maximum premium would be too low (because the maximum premium is based on the standard premium). The maximum premium is the cap on the amount of claims plaintiff must pay under the NDPRP.

If the cost of claims in a given year exceeds the maximum premium, then USAIG must pay that excess amount. Therefore, if the maximum premium were too low, USAIG would be paying earlier than it otherwise would have. The substance of the letter demonstrates that this was the reason that USAIG wrote to Mr. Hall and did not have the purpose or effect of putting plaintiff on notice that it was deferring present NDPRP costs to the future.

More importantly, the court agrees with plaintiff that, even if the letter effected notice that rates used to pay standard premiums were too low, such notice is overridden by the mechanism utilized under the NDPRP. In determining the amount to be billed to (or to be credited to) plaintiff for each policy year or at final settlement, the insurer first calculates the cumulative indicated retrospective premium, which represents the "actual" cost of claims for a given year. The cumulative indicated retrospective premium then is compared to the standard premium amounts previously paid by plaintiff under the program, and the difference is the amount owing to (or credited by) the insurer. If the rates used by plaintiff in calculating the standard premium were too low, the standard premium might be insufficient to cover the indicated retrospective premium. Nevertheless, this would have no impact, because plaintiff still must make up the difference at the end of each year. Thus, whether plaintiff paid standard premiums that were too low or too high would have no impact on future claims,

8. The parties stipulated to the following: In December 1990, Johnson Controls, Inc., and Marsh & McClennan, JCI's insurance broker, examined NDPRP records to, among other things, discover what had caused large cost increases in the upcoming 34th and 35th preliminary settlements for all NDPRP projects, including ETR. A December 1990 report was prepared entitled "National Defense Projects Rating Plan Findings." The report concluded that: (a) "current year losses more than doubled for each of 34th (1987/88) and 35th (1988/89) adjustments as compared with the current year losses of the four previous adjustments (30th through 33rd)"; (b) "average size of the current year losses in the 34th adjustment as compared with the average of the current year losses in the previous four years (30th–33rd) increased more than 100%, from $1,853 to $3,726"; (c) "development of prior year losses for the 34th adjustment totaled $2.3

million ... more than $1 million higher than the average prior year loss development for the four preceding years," and of this $2.3 million, "approximately $700,000 is from four worker's compensation claims and $750,000 is from three general liability claims."

9. The court makes no finding with regard to the parties' exchanges about whether the Government was somehow at fault for formulating the NDPRP. *See* Pl.'s Br. filed July 28, 2000, at 41; Def.'s Br. filed Oct. 20, 2000, at 11; Pl.'s Br. filed Nov. 17, 2000, at 17 (asserting that the Government incorrectly characterized plaintiff's argument as "shifting blame to the Government."). Whether the responsibility for designing the NDPRP itself lies with the Government or not is irrelevant. Significant is the fact that the *cost overruns were unforeseeable under operation of the NDPRP.*

because plaintiff was always required to pay the "actual" indicated retrospective premium at the end of each year.

### 2) *Were the cost overruns avoidable?*

The LOCC does not apply when the contractor does not possess a "meaningful decision to avoid the incurrence" of costs, such as by stopping work. *Dames & Moore,* 93–1 BCA ¶ 25,487, at 126,976, 1992 WL 310239. "If a 'contractor, through no fault or inadequacy on its part, has no reason to believe, during performance, that a cost overrun will occur and the sole ground for the contracting officer's refusal [to fund a cost overrun] is the contractor's failure to give proper notice of the overrun' the contractor is entitled to have the overrun funded." *Advanced Materials,* 108 F.3d at 311 (quoting *General Elec. II,* 194 Ct.Cl. at 687–88, 440 F.2d at 425 (quoted in *RMI,* 800 F.2d at 248)). Based on much of the same reasoning summarized above, plaintiff again urges that the LOCC should not apply. Plaintiff maintains that the cost overruns are attributable to escalation in the values of workers' compensation and liability claims and that it was unable to avoid the costs of a claim once it had been made. Plaintiff also points out that these escalations occurred after the termination of the contract, so that it was unable to cease work.

Defendant rejoins that if post-performance cost overruns were not to be included within the scope of the LOCC, then the contract expressly should have so stated. Because both parties knew about the possibility of post-performance NDPRP overruns, defendant surmises that, if plaintiff did not want to bear responsibility for such overruns, plaintiff could have negotiated such a contingency in the contract. Plaintiff did not do so, and to assert that such overruns are now not subject to the LOCC writes it out of the contract for "certain foreseeable circumstances." Def.'s Br. filed Oct. 20, 2000, at 13.

Therein lies the missing link in defendant's argument—the court has found that the post-performance cost overruns were not foreseeable. Such a finding does not render the LOCC meaningless, because the LOCC still contemplates that the contractor would notify the Government, if for example, it became aware during performance of the contract of potential cost overruns, even if those cost overruns would themselves occur post-performance. At that time the costs would be avoidable—either by an order to stop work or possibly by restructuring the insurance program. Such a reading is what the parties contemplated when they specifically included NDPRP costs under the LOCC.[10] However, once performance had ceased, plaintiff was unable to avoid the further escalation of pre-termination claims.

Defendant's reliance on *Ebasco Servs., Inc. v. United States,* 37 Fed.Cl. 370, 379–80 (1997), is unavailing for the same reason. The court recognized that inherent in its interpretation of the LOCC was the fact that both parties should "understand that the contractor can stop work when its costs equal the amount the [G]overnment allotted to the contract. . . ." *Id.* at 379. It was this ability to control costs by stopping work, along with a number of other factors, that led the court to conclude that the LOCC "should function to induce negotiations between the contractor and the contracting officer as the contractor approaches the contract ceiling." *Id.* In the case at bar, it was not possible for plaintiff to foresee costs under the NDPRP because they were future costs generated by claims arising during the contract performance period. Additionally, by the time the overrun costs became apparent, the time for negotiations between plaintiff and the Air Force had long since passed: The overruns associated with the 34th through 41st preliminary settlements were billed to plaintiff on January 30, 1991, while contract performance under the 1984 ETR Contract ended on October 7,

---

10. Defendant makes a final argument that plaintiff somehow is responsible itself for the cost overruns because of "poor attempts to settle cases." Def.'s Br. filed Oct. 20, 2000, at 14 (quoting a 1994 Defense Logistics Agency Contractor Insurance/Pension Review). Settling a claim implicates a multitude of circumstances, not the least of which is consent of the claimant. Plaintiff cannot be charged with responsibility for this circumstance, and therefore settling claims was not an action that plaintiff could accomplish unilaterally in order to prevent cost overruns.

1988. The rationale for applying the LOCC as a bar to reimbursement to the contractor in *Ebasco* is not present.

### 3) *Was the Government prejudiced by plaintiff's failure to provide notice?*

Although plaintiff already has met one of the several grounds for finding that the LOCC does not apply, and these grounds are alternative showings, the court addresses plaintiff's remaining arguments for completeness.

■ "[L]ack of advance notice is not a legitimate bar to funding an overrun if it is unlikely that the Government would have directed work to stop, even if it had prior notice." *Dames & Moore*, 93–1 BCA ¶ 25,-487, at 126,976, 1992 WL 310239. Plaintiff posits that even if the Air Force had been informed of potential cost overruns, it would not have ordered work to stop. Plaintiff describes the Air Force as "eager," Pl.'s Br. filed July 28, 2000, at 44, to continue services under the contract and notes that when previous LOCC notices were given, the Air Force chose to fund those overruns. Plaintiff also contends that any LOCC notice would have been so speculative that the Air Force would not have acted to stop work. This argument does not constitute a basis for relief.

Defendant correctly points out that plaintiff's argument relies on inferences and suppositions having little basis in the record. While the Air Force may have wanted services to continue at the Eastern Test Range, it certainly was not willing to do so at any cost. More importantly, defendant maintains that the Air Force would have had other options to reduce costs if LOCC notice had been given, such as stopping only part of the work or substituting a less expensive insurance program. Plaintiff has not shown that the Air Force was likely to continue performance if notice were given, and it is plaintiff's burden to do so. Thus, lack of prejudice is not a ground to prevent application of the LOCC.

### 4) *Did the contracting officer exercise his discretion to fund the overrun?*

Plaintiff argues that the LOCC should not be applied in this case because the contracting officer funded an overrun for the 34th through 36th NDPRP preliminary settlements. These settlements make up more than $4 million of the $16 million sought by plaintiff.

On March 25, 1992, the paying office at Patrick Air Force returned an invoice underlying plaintiff's reimbursement claim due to insufficient funds. Contracting Officer John Moore wrote to the Air Force "[r]equest[ing] action be taken to obtain FY 88 funds in the amount of $4,139,001.48." to pay the invoice. Relying on *General Elec. I*, plaintiff argues that the contracting officer effectively exercised his discretion in funding the overrun.

In *General Elec. I*, after being appraised of an overrun where no LOCC notice had been provided, an Army legal officer wrote a letter stating that the contracting officer had discretion to fund the overrun and recommending that the contracting officer do so. The contracting officer signed the letter under the heading "Concur With Recommendation." A later contracting officer refused to fund the overrun. The United States Court of Claims ruled that the discretion to fund an overrun lay with "the person delegated as decision-maker by the parties," *id.* at 629, 412 F.2d at 1221, and that "the decision of a duly authorized contracting officer could not be defeated," *id.* at 630, 412 F.2d at 1221, by the decision of a later funding official.

*General Elec. I* is on par with the facts of this case. Contracting Officer Moore decided that funding was appropriate notwithstanding a shortage of funds. He memorialized that decision by letter to the Air Force. The LOCC cannot now be invoked to disturb this decision.[11]

### 5) *Do the equities favor application of the LOCC?*

Both parties argue that the equities favor their respective positions. Plaintiff, relying

---

**11.** The court notes that Contracting Officer Moore's funding decision only covered plaintiff's 1991 CDA claims.

on *General Elec. II,* 194 Ct.Cl. at 684, 440 F.2d at 423, argues that, if the Government does not reimburse plaintiff for the insurance costs it paid under the program, the Government will obtain a windfall in the form of free insurance coverage. Defendant cites plaintiff's notice of the overrun as far back as 1980 and argues that the equities therefore run in favor of applying the LOCC.

What occurred in this case was a result of the NDPRP's operation per the parties' stipulations. Thus, neither side can cite the other for inequitable conduct.[12]

### 3. *Modification P00333*

Defendant argues that a portion of insurance costs for which plaintiff seeks reimbursement are barred from recovery by operation of Modification P00333. Executed in 1977, Modification P00333 was a modification to the 1972 ETR Contract. The parties disagree as to whether this modification precludes plaintiff's recovery of premiums paid under the 1978 and 1984 ETR Contracts. Specifically, these premiums were paid after 1977 policy periods to cover changes in values to claims made before 1977. Defendant argues that Modification P00333 foreclosed plaintiff's right to seek further compensation for insurance costs related to the 1972 ETR Contract, while plaintiff maintains that Modification P00333 was only intended to provide additional funding for NDPRP costs incurred in fiscal year 1977. Although both parties offer substantial evidence in support of their arguments, the issue can be resolved based on the modification itself.

■ To determine the meaning of a particular contractual provision, the court first must look to the plain meaning of the contract. *See Textron Defense Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998); *Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir.1993). When the contract language is unambiguous, the court's inquiry is at an end, and the plain language of the

contract is controlling. *See Textron Defense,* 143 F.3d at 1469. The contract must be considered as a whole and interpreted to " 'effectuate its spirit and purpose,' " giving " 'reasonable meaning to all parts.' " *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991) (quoting *Arizona v. United States,* 216 Ct.Cl. 221, 235–36, 575 F.2d 855, 863 (1978)); *see Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985). Such construction " 'will be preferred to one which leaves a portion of [the contract] useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.' " *Gould,* 935 F.2d at 1274 (quoting *Arizona,* 216 Ct.Cl. at 236, 575 F.2d at 863); *see Fortec Constructors,* 760 F.2d at 1292.

■ The court begins, as it must, with the plain language of the provision. *See Textron* at 1468. Modification P00333 contained a "Release of Claims" provision, which provided:

> In consideration of the modification(s) agreed to herein as complete equitable adjustments for the Contractor's Contract Change Proposal 77–37 [13] claims, the Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts or circumstances giving rise to the aforesaid claims.

The language of Modification P00333 is clear: It is directed to "liability under this contract." The "contract" is the 1972 ETR Contract, not the 1984 ETR Contract upon which plaintiff bases its claim for reimbursement. The modification has no bearing on how NDPRP costs would be calculated in the future under the 1984 ETR Contract. It does not, as defendant puts it, provide limits on later retrospective premium reimbursements. The language of Modification P00333 is unambiguously limited only to the 1972 ETR Contract, specifically the close-out costs incurred in fiscal year 1977.

---

12. This is true notwithstanding plaintiff's well-taken position that the Air Force's position that defendant advances in this case arose only in 1996 and is inconsistent with its actions for the previous 14 years. *See* pp. 493–94 *infra.*

13. Contract Change Proposal 77–37 ("CCP 77–37") originally was not included as an exhibit by either party. It was provided to the court during oral argument and is Exhibit 1 to that proceeding.

Contract Change Proposal 77–37 ("CCP 77–37") (upon which Modification P00333 is based) reinforces this interpretation. CCP 77–37, contains numerous recitations that the costs discussed therein are "allocable to FY 1977." CCP 77–37 at A008169. Modification P00333 was issued to provide an estimate of what plaintiff considered that it needed to pay in reimbursement premiums for fiscal year 1977.[14] It was not intended to foreclose all payments under the NDPRP from that point forward.

Defendant's arguments to the contrary rely on a tortured reading of Modification P00333 as supplemented by extrinsic evidence. Interpreting Modification P00333 as anything other than a complete release of all claims under the 1972 ETR Contract, defendant postulates, would require reading the 1984 ETR Contract as a change to Modification P00333. In other words, defendant reasons that because Modification P00333 must be read to preclude any claims under the NDPRP, an express modification of Modification P00333 in the 1984 ETR Contract would be required to re-allow claims under the NDPRP. This interpretation fails in that it assumes its preferred reading of the modification as the predicate for the bizarre consequences that defendant presents. The court concludes that Modification P00333, on its face, does not preclude recovery of premiums under the NDPRP.

Defendant also offers documents that it claims raise a genuine issue of material fact with respect to Modification P00333. Defendant points to a December 13, 1976 letter from Mr. Capley, Manager, Contracts and Legal for plaintiff, to the contracting officer suggesting that the parties include "full funding as of 30 September 1977" of NDPRP costs in the close-out of the 1972 ETR Contract. Defendant argues that this letter suggests that plaintiff considered itself capable of determining all future liabilities for NDPRP claims under the 1972 ETR Contract. Defendant also offers a letter from Contracting Officer Brown, dated June 24, 1977, listing three items of costs from the 1972 ETR Contract to be negotiated into the

1978 ETR Contract. Because NDPRP costs are not listed, defendant argues, NDPRP costs incurred under the 1972 ETR Contract must have been closed out pursuant to Modification P00333, to the end that no further funding was necessary under the 1978 ETR Contract.

Because Modification P00333 is unambiguous, it is not necessary to rely upon this evidence to establish its meaning. *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996) (disallowing parol evidence in unambiguous, integrated agreement). Parol evidence cannot be relied upon to alter the express, unambiguous terms of a contract. *Greco v. Dep't of Army*, 852 F.2d 558, 560 (Fed.Cir.1988) (same). In any event, the court does not view defendant's evidence as supporting an interpretation that Modification P00333 was meant to preclude plaintiff from recovering NDPRP insurance costs. The 1976 Capley letter suggesting "full funding as of September 1977" of NDPRP costs falls well short of establishing that plaintiff could, or did, surmise what its future NDPRP costs would be. A lynchpin of the NDPRP is that claims accrue under one contract, but the costs associated therewith may not be known until future years under a successor contract. Similarly, the omission of NDPRP costs in the 1977 Brown letter listing costs to be negotiated into the 1978 ETR Contract is not significant. Plaintiff is suing under the 1984 ETR Contract, not the 1972 ETR Contract. As the costs would arise and be payable under the later contract, no purpose would have been served by negotiating whether they should be carried over from the 1972 ETR Contract to the 1984 ETR Contract. In contrast, the three items listed—vacation, pension costs, and storage and maintenance costs—were carried forward from the 1972 to the 1984 Contract per Modification P00333. The Brown letter therefore cannot be construed to raise a genuine issue of material fact as to whether both parties intended to close out all pre–1978 claims.

Conversely, plaintiff's proffered extrinsic evidence of the parties' conduct under Modi-

---

**14.** Modification P00333 estimated that plaintiff would be paying $550,000.00 for reimbursable

insurance premiums and allowed plaintiff that amount.

fication P00333, while not necessary to establish the meaning of Modification P00333, nonetheless comports with the court's interpretation. As has been recognized by both appellate courts, "how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself." *Macke Co. v. United States,* 199 Ct.Cl. 552, 556, 467 F.2d 1323, 1325 (1972); *see also Saul Subsidiary II Ltd. P'ship v. Barram,* 189 F.3d 1324, 1326 (Fed.Cir.1999).

Plaintiff notes that after Modification P00333 was executed, the Government continued to pay reimbursements premised on losses incurred under the 1972 ETR Contract. *See* Pl.'s Br. filed July 28, 2000, App. Ex 9, at 129–32.[15] Had the Government viewed Modification P00333 as a final close-out of all claims under the 1972 ETR Contract, surely it would not have reimbursed plaintiff for these costs. Indeed, the parties eventually did complete a final close-out of the 1972 ETR Contract. When this occurred, plaintiff sent an executed copy of the Contractor's Release, dated July 1, 1981, along with plaintiff's final invoice under the 1972 ETR Contract. The 1981 Contractor's Release made a specific reservation for 52 claims that were still outstanding under the 1972 ETR Contract. The 1981 Contractor's Release also made "specific reservation" with

respect to "claims or credits pending or which may develop in connection with the [NDPRP] ... the costs of which may be paid under or credited to subsequent contracts." This conduct is further evidence consistent with the interpretation that the parties did not intend Modification P00333 to foreclose reimbursement for 1972 ETR Contract claims.

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Plaintiff's motion for summary judgment on liability is granted, and defendant's cross-motion for summary judgment is denied.

2. Paragraph 3 of the order scheduling trial entered on June 20, 2000, is vacated.

3. By February 12, 2001, the parties shall file a Joint Schedule for resolving the issue of the amount that plaintiff is entitled to recover.

---

**15.** Exhibit 9 to plaintiff's motion for summary judgment details a number of claims that made up the 1978–79 preliminary settlement of premium. It shows that even if a claim grew out of the 1972 ETR Contract, it was still computed as part of the 1978–79 preliminary settlement of premium. This continued notwithstanding Modification P00333. The Government has stipulated that it reimbursed plaintiff for all preliminary settlements of premiums until 1991, *see* Joint Stip. ¶ 77, whether or not these premiums included claims arising under the 1972 ETR Contract.