**GENERAL ELECTRIC COMPANY,**
a Corporation
v.
**The UNITED STATES.**
No. 503–69.

United States Court of Claims.
April 16, 1971.

Francis J. Robinson, Washington, D. C., attorney of record, for plaintiff.

James A. Pemberton, Jr., Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

COLLINS, Judge.

This case arose from a cost overrun under a contract between plaintiff and defendant's Department of the Army. The relevant facts were stipulated in proceedings before the Armed Services Board of Contract Appeals.

Plaintiff, General Electric, and defendant entered into the contract involved in this case on September 19, 1963. The contract, which involved research and development work relative to a chemical/biological warning system, was negotiated and was of the cost-plus-incentive-fee variety. All work under the contract was required to be completed by May 31, 1964. The final report was received by the Government project manager, in time, on June 8, 1964.

At the outset, the amount of the contract, including target fee, was $800,000. The contract was amended, however, at a later time to increase the total amount, including target fee, to $835,800. The incentive formula provided for a 15-cent increase in the target fee for every dollar by which allowable costs fell short of the target cost and for a 15-cent reduction in the target fee for every dollar by which allowable costs exceeded the target cost.

The contract provided that allowable costs would include, among other things:

2. *Indirect Costs:* Allowances for indirect costs, including independent research and development, not otherwise reimbursable as a direct charge hereunder, at such provisional billing rates as may be acceptable to the Contracting Officer. It is understood and agreed that such rates shall be provisional rates for billing purposes only and shall be subject to negotiations and revision to the final negotiated indirect cost rates, based upon Government audit of the Contractor's books and records on a fiscal year basis ending 31 December of each year, and in accordance with the terms of the General Provision of this contract, entitled "Negotiated Overhead Rates."

Also included in the contract was the standard Negotiated Overhead Rates clause which provided that allowable indirect costs under the contract would be arrived at by the use of negotiated overhead rates, and furthermore:

(d) The results of each negotiation shall be set forth in a modification to this contract, which shall specify (i) the agreed final rates, (ii) the bases to which the rates apply, and (iii) the periods for which the rates apply.

(e) Pending establishment of final overhead rates for any period, the Contractor shall be reimbursed either at negotiated provisional rates as provided in the Schedule or at billing rates acceptable to the Contracting Officer, subject to appropriate adjustment when the final rates for that period are established. To prevent substantial over or under payment, the provisional or billing rates may, at the request of either party, be revised by mutual agreement, either retroactively or prospectively. Any such revision of negotiated provisional rates provided in the Schedule shall be set forth in a modification to this contract.

Pursuant to ASPR § 3.706,[1] the military departments maintained at the time

---

1. " § 3.706 Coordination.

"When more than one Military Department contemplates the use of negotiated final overhead rates with the same contractor, the service having the preponderance of cost-reimbursement type work will, generally, sponsor and conduct the negotiation. Each Department having an interest will be notified of the pending negotiation and will be invited to participate in the negotiation. If a Department does not have a representative at the negotiation, the sponsoring Department will represent the absentee Department. The results of the negotiation will be binding upon all Departments. At the completion of the negotiation, the sponsoring Department will prepare and distribute to the other Departments a Negotiation Report or Summary as provided for in § 3.705(e). Each Military Department shall thereupon amend or supplement the affected contracts in accordance with the rates and other data set

of this contract an inter-service committee, commonly referred to as the Tri-Services Committee, which negotiated final overhead rates with contractors having cost-reimbursement type contracts with more than one military department. The ASPR section provided that, after a determination of final overhead rates by the Tri-Services Committee, "[e]ach Military Department shall thereupon amend or supplement the affected contracts in accordance with the rates and other data set forth in the negotiation report or summary."[2]

For the calendar year 1963 the provisional billing rates applicable to the contract were as follows:

Engineering, Drafting & Labor _____ 133.0%
Independent Research & Development _____ 1.8%
General & Administrative _____ 11.7%

Final overhead rates for 1963 were negotiated in 1965 and were incorporated into the contract by the contracting officer on May 2, 1966. The final rates were as follows:

Engineering, Drafting & Labor _____ 139.7%
Independent Research & Development _____ 1.8%
General & Administrative _____ 12.4%

For the calendar year 1964 the provisional rates were:

Engineering _____ 155.0%
Independent Research & Development _____ 1.8%
General & Administrative _____ 14.6%

The final rates for 1964 were negotiated in 1965 and 1966 and were as follows:

Engineering, Drafting & Laboratory Rates __ 169.80%
Material Rates _____ 11.58%
General & Administrative _____ 14.85%
Transfer Expense _____ 1.70%
CIRP _____ 2.05%

Unlike the final rates for 1963, however, the final rates for 1964 were never incorporated into the contract.

Plaintiff's request of the contracting officer on December 16, 1966, for additional funds owing to the difference between the provisional and final overhead rates for 1963 and 1964 was denied. The contracting officer's decision was based on plaintiff's failure to give notice to the Government of the possibility of a cost overrun in accordance with the contract's Limitation of Cost clause (hereinafter LOCC):

*LIMITATION OF COST* (FEB. 1959) (ASPR 7–402.2)

(a) It is estimated that the total cost to the Government, exclusive of any fixed fee, for the performance of this contract will not exceed the estimated cost set forth in the Schedule, and the Contractor agrees to use his best efforts to perform the work specified in the Schedule, and all obligations under this contract within such estimated cost. If at any time the Contractor has reason to believe that the costs which he expects to incur in the performance of this contract in the next succeeding sixty (60) days, when added to all costs previously incurred, will exceed seventy-five percent (75%) of the estimated cost then set forth in the Schedule, or if at any time, the Contractor has reason to believe that the total cost to the Government, exclusive of any fixed fee, for the performance of this contract will be substantially greater or less than the then estimated cost thereof, the Contractor shall notify the Contracting Officer in writing to that effect, giving the revised estimate of such total cost for the performance of this contract.

(b) The Government shall not be obligated to reimburse the Contractor for costs incurred in excess of the estimated cost set forth in the Schedule, and the Contractor shall not be obligated to continue performance under the contract or to incur costs in excess of the estimated cost set forth in the Schedule, unless and until the Contracting Officer shall have notified the Contractor in writing that such

forth in the negotiation report or summary." 32 C.F.R. § 3.706 (1970).

2. *See* note 1 *supra.*

estimated cost has been increased and shall have specified in such notice a revised estimated cost which shall thereupon constitute the estimated cost of performance of this contract. When and to the extent that the estimated cost set forth in the Schedule has been increased, any costs incurred by the Contractor in excess of such estimated cost prior to the increase in estimated cost shall be allowable to the same extent as if such costs had been incurred after such increase in estimated cost.

It was the contracting officer's opinion that General Electric, in failing to give notice as to the possibility of an overrun, "did thereby deprive the Government of its prerogative to prevent and avoid a cost overrun."

Plaintiff's timely appeal to the Armed Services Board of Contract Appeals was denied. General Elec. Co., 69–1 BCA ¶ 7708 (ASBCA 1969).

The parties stipulate that utilizing the final negotiated overhead rates would result in adding $71,209.86 ($168 for 1963 and $71,041.86 for 1964) to the contract cost. It is also stipulated that applying the 15-percent incentive formula to the increase in cost results in a $10,-656.28 decrease in the fee. Finally, the parties stipulate that reducing the increase in cost by the reduction in the incentive fee yields $60,385.58 and that this is the amount plaintiff is seeking.

For the reasons set forth below, we find that plaintiff is entitled to recover in full.

■ The contracting officer erred in assuming that plaintiff was required to give timely notice of the overrun before it was incurred. By its own terms, paragraph (a) of the LOCC relieved General Electric of the notice requirement. Paragraph (a) provides that "[i]f at any time the Contractor has reason to believe" that a cost overrun is imminent the contractor is required to so notify the contracting officer. If the contractor has no reason to believe that an overrun is imminent, he is not required

to give notice. As pointed out below, at no time during performance of the contract did General Electric have reason to know of its overrun. It was, therefore, excused from the notice requirement.

In General Elec. Co. v. United States, 412 F.2d 1215, 188 Ct.Cl. 620 (1969), this court dealt with the LOCC and the role of the contracting officer. In that case the court, citing board decisions, stated that under the clause "although the Government is not compelled to fund an overrun in the absence of proper notice, it is within the discretionary authority of the contracting officer to allow the additional costs." *Id.* at 627, 412 F.2d at 1220. *See* United Shoe Mach. Corp., 68–2 BCA ¶ 7328, at 34,091 (ASBCA 1968); The Marquardt Corp., 66–1 BCA ¶ 5576, at 26,069 (ASBCA 1966). As we view it, the question in this case is whether the contracting officer abused his discretion in refusing to allow the additional costs incurred by General Electric.

On the facts of this particular case, we are of the opinion the contracting officer abused his discretion under the LOCC and that the board erred in supporting his decision.

As noted briefly above, the LOCC does not require the contracting officer to deny additional funding, where the contractor incurs a cost overrun, without first obtaining the contracting officer's approval. The clause appears to anticipate that in some circumstances where advance authorization is not given it would be inequitable for the Government to refuse additional funding. For example, in Scherr & McDermott, Inc. v. United States, 360 F.2d 966, 175 Ct.Cl. 440 (1966), it was held that the contractor was relieved of the requirement of obtaining prior approval for an increase in the contract's cost limitation where the contractor's inability to determine actual overhead was traceable to the Government's failure to audit.

In the present case it is not argued that plaintiff's failure to timely seek advance authorization for the overrun is in

424

any way attributable to fault on the Government's part. It is contended, however, and supported by the board's opinion, that General Electric, through no fault or inadequacy of its own, had no notice itself of the overrun until well after completion of its performance. The board stated that the accounting evidence was generally consistent with plaintiff's contention that:

> * * * at the completion date of 31 May 1964 and at the time the supplement to the final report was made in July–August 1964, its current cumulative expenditures and commitments, based in part upon its then cumulative year-to-date actual overhead rates, were within the total estimated cost of the contract and therefore there . was no revised estimate of the total estimated cost which could then be given.

69–1–BCA ¶ 7708, at 35,779. In effect, the board agreed with plaintiff's argument that obtaining advance approval for the overrun in this case was impossible. The Government advances two arguments with respect to plaintiff's position on the issue of impossibility of notice.

■ First, defendant argues that counsel for plaintiff expressly waived reliance on the theory of impossibility before the board and, second, that the board made no findings as to whether plaintiff had knowledge, beforehand, of the overrun. We do not think these arguments are supportable. Although plaintiff's counsel did assert before the board that plaintiff was not "affirmatively relying" on a theory of impossibility, he also stated:

> With regard to the question raised by the Government concerning notice * * * it is appellant's position there are sufficient facts in this record to rebut any claim the Government may make as to either the applicability of that clause [the LOCC] or the timing of any notice allegedly required under it.

Record at 10. On oral argument before this court counsel for plaintiff explained that he had disavowed "affirmative reliance" on the theory that notice was impossible in order to avoid having the burden of proof on that issue. However, we are satisfied that plaintiff's counsel never waived the theory.

■ With respect to defendant's contention that the board made no findings as to plaintiff's knowledge of the overrun before it was incurred, we need only refer to the board's statement (to which reference has already been made) that the accounting evidence was generally consistent with plaintiff's contention that it had no advance notice of the overrun. Although the board may not have made a finding of fact, in the technical sense of the term, relating to plaintiff's knowledge or lack of knowledge of its overrun during contract performance, the board did state as a fact that the accounting evidence generally supports the plaintiff's position. Although this statement is perhaps not as conclusive as it might be, it represents the board's considered appraisal of all the accounting evidence. Moreover, defendant has not called our attention to any "substantial" evidence that plaintiff did indeed have advance knowledge of the overrun. Under these circumstances this case appears to be one of those "situations in which the court would be warranted, on the basis of the administrative record, in granting judgment for the contractor without the need for further administrative action." United States v. Carlo Bianchi & Co., 373 U.S. 709, 717, 83 S.Ct. 1409, 1415, 10 L.Ed.2d 652 (1963); see Sherwin v. United States, 436 F.2d 992, 193 Ct.Cl. 962 (Jan. 1971).

■ Notwithstanding its above-quoted statement, the board sustained the contracting officer's decision. It did so on the ground that "absent either Government fault or intervention causing post-performance overhead rate increases within the contractor's accounting period, the risk of such increases in overhead cost ratio, whether or not fore-

seeable during performance, clearly must be the contractor's * * *." 69–1 BCA ¶ 7708, at 35,780. This allocation of risk by the board was erroneous—it totally ignores the discretion of the contracting officer in allowing or denying additional funding for cost overruns. Clearly, where the contracting officer possesses such discretion it can scarcely be said that the contractor assumes the risk of a cost overrun incurred without prior authorization.

■ As stated above, it is our opinion that the contracting officer in the present case abused his discretion under the LOCC in refusing to fund the overrun. The board found that General Electric could not have known of the overrun in time to notify the contracting officer and receive the latter's approval for an increase in funding. Moreover, there is no claim that General Electric was in any way to blame for its lack of timely knowledge of the overrun or that its accounting procedures were inadequate. Furthermore, there is no evidence in the record that the Government was displeased with General Electric's performance under the contract. Under these circumstances we hold that the contracting officer did not have discretion to refuse additional funding.

In so holding, we are comforted by the Comptroller General who stated as follows in a 1964 opinion:

> The making of an equitable adjustment at this time for overhead costs which exceeded allowances to the Arthur D. Little Company at the provisional rates might be proper since this Office has allowed similar claims where it appeared that contract cost limitations were exceeded solely because of the contractors' inability to ascertain during contract performance whether the specified provisional overhead rates in their contracts were sufficient to cover all allowable types of overhead costs.

B–137343 (Aug. 12, 1964) (unpublished). *See also* B–127863 (June 6, 1956) (unpublished).

We would stress that our decision in this case is not intended to encourage contractors to utilize less than fully acceptable accounting procedures. Where a contractor fails to obtain advance approval for an overrun and later claims that the giving of timely notice was impossible, the contractor's accounting methods and procedures should be a matter for the contracting officer's first concern.

In summary, we hold that a contracting officer abuses his discretion under paragraph (b) of the Limitation of Cost clause if he refuses to fund a cost overrun where the contractor, through no fault or inadequacy on its part, has no reason to believe, during performance, that a cost overrun will occur and the sole ground for the contracting officer's refusal is the contractor's failure to give proper notice of the overrun.

Because of our disposition of this case we intimate no opinion as to plaintiff's alternative argument that the Negotiated Overhead Rates clause necessarily prevails over the LOCC. Furthermore, since we do not deal with plaintiff's alternative argument and since defendant admits that there is no showing that the funding of plaintiff's overrun by the Government would violate the Anti-Deficiency Act, 31 U.S.C. § 665 (1964), we express no opinion as to the act's applicability in cost overrun situations.

Plaintiff's motion for summary judgment is granted, defendant's cross-motion for summary judgment is denied, and judgment is entered for plaintiff in the amount of sixty thousand three hundred and eighty-five dollars and fifty-eight cents ($60,385.58).