**RMI, INC., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 86–659.**

United States Court of Appeals,
Federal Circuit.

Aug. 29, 1986.

Robert Dahlquist, Latham & Watkins, San Diego, Cal., argued for appellant. With him on brief was Hayden J. Trubitt, San Diego, Cal.

Jeffrey Mulhall, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director, Washington, D.C.

Before MARKEY, Chief Judge, NICHOLS, Senior Circuit Judge, and BISSELL, Circuit Judge.

BISSELL, Circuit Judge.

RMI, Inc. appeals from the decision of the Armed Services Board of Contract Appeals (ASBCA or Board) sustaining a contracting officer's final decision denying RMI's request for reimbursement of its cost overrun. 85–3 BCA ¶ 18,231 (ASBCA 1985). We vacate the Board's decision and remand the case for proceedings consistent with this opinion.

## BACKGROUND

RMI appeals the decision of the Board denying RMI's recovery of a cost overrun in the performance of Contract No. N00024–80–C–2204 (contract) with the United States Defense Contract Administration Services Region, Los Angeles, of the Defense Logistics Agency (agency). The contract was one of two in a Department of the Navy (Navy) procurement process by which two contractors developed competing system designs for an advanced marine vehicle. Upon completion of these

development contracts, the Navy was to select a contractor for actual production of the vehicle. RMI was awarded the contract on June 5, 1980. The term of the contract was for a period of 17 months, extending from June 1980 to November 1981. On June 1, 1981, the Navy terminated for convenience RMI's contract and awarded the follow-on production contract to the other contractor.

In January 1982, RMI submitted to the Termination Contracting Officer (TCO) its Termination Settlement Proposal (proposal) in which it claimed certain contract costs, termination expenses and contract fees, including the cost overrun. RMI stated that the overrun was attributable to unexpected and unforeseeable increases in engineering and business overhead rates which were not discovered until after termination of the contract. The proposal and its underlying documentation was audited by the Defense Contract Audit Agency. The audit, Audit Report No. 4151–3B171001, indicated that (i) RMI had completed all tasks as required by the contract and as directed by the Navy; (ii) its job cost accounting system was acceptable for recording actual performance costs under cost-type contracts; and (iii) RMI had actually incurred the amounts representing the cost overrun but questioned payment of these amounts because they were overruns. In order to examine RMI's claim that it had no reason to believe prior to the termination of the contract that the overhead expenses would exceed the estimated overhead expenses, RMI and the TCO agreed to a supplemental audit to examine the overhead rates. Prior to completion of the supplemental audit, the TCO by letters dated April 12, 1983, and June 28, 1983, first informed RMI that he had neither the funding nor the authority to recognize and negotiate the cost overrun and then made a unilateral determination that RMI's request for payment of the cost overrun was without merit because of RMI's failure to notify the agency that an overrun would occur under the Limitation of Cost Clause (LOCC) in the contract.

RMI appealed the TCO's decision to the Board and submitted its case on affidavits and briefs as permitted by Rule 11 of the Board's Rules of Procedure. Before the Board, RMI argued that the TCO's decision was improper as it was based solely on RMI's failure to give notice of the overrun and that the TCO did not consider, as required by the LOCC, whether RMI knew or should have known that a cost overrun would occur at year-end. The agency produced no evidence. Instead, the agency stated, in response to RMI's interrogatories, that it had no specific information concerning whether RMI knew or should have known of a cost overrun.

In its decision on RMI's appeal, the Board denied RMI's claim for costs incurred in excess of the maximum contract target amount. The Board determined that RMI "failed to prove the overrun in question was not reasonably foreseeable and the TCO did not abuse his discretion in refusing to provide the requested funding." 85–3 BCA ¶ 18,231 at 91,547. RMI appeals to this court pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613.

## ISSUE

Whether the Board correctly found that RMI failed to meet its burden of establishing that it reasonably could not have foreseen the cost overrun.

## OPINION

Under our scope of review, the Board's conclusions of law are not final and are thus freely reviewable, while the Board's findings of fact are final and our review is limited to a determination whether those findings are arbitrary, capricious, based on less than substantial evidence, or rendered in bad faith. 41 U.S.C. § 609(b) (1982).

The LOCC at issue in this appeal, DAR § 7–402.2(a) (1966 OCT), provides in pertinent part:

(a) It is estimated that the total cost to the Government for the performance of this contract, exclusive of any fee, will not exceed the estimated cost set forth in the Schedule, and the Contractor agrees to use his best efforts to perform the work specified in the Schedule and all obligations under this contract within such estimated cost. *If, at any time, the*

*Contractor has reason to believe that the cost which he expects to incur in the performance of this contract in the next succeeding sixty (60) days, when added to all costs previously incurred, will exceed seventy-five percent (75%) of the estimated cost set forth in the Schedule, or if, at any time, the Contractor has reason to believe that the total cost to the Government for the performance of this contract, exclusive of any fee, will be greater or substantially less than the then estimated cost hereof, the Contractor will notify the Contracting Officer in writing to that effect,* giving the revised estimate of such total cost for the performance of this contract.

85–3 BCA ¶ 18,231 at 91,541 (emphasis in original).

One of our predecessor courts has held that by its own terms the above-cited portion of the LOCC can relieve a contractor of the notice requirement. *General Electric Company v. United States,* 194 Ct.Cl. 678, 440 F.2d 420, 423 (1971). The LOCC "provides that '[i]f at any time the Contractor has reason to believe' that a cost overrun is imminent the contractor is required to so notify the contracting officer." *Id.* Conversely, "[i]f the contractor has no reason to believe that an overrun is imminent, he is not required to give notice." *Id.* Therefore if a "contractor, through no fault or inadequacy on its part, has no reason to believe, during performance, that a cost overrun will occur and the sole ground for the contracting officer's refusal [to fund a cost overrun] is the contractor's failure to give proper notice of the overrun" the contractor is entitled to have the overrun funded. *Id.* at 425.

■ Here, the Board placed the burden of proving on RMI that the cost overrun was not reasonably foreseeable. *See General Time Corporation,* 75–2 BCA ¶ 11,462. We agree that this is a proper allocation of the burden of proof. However, in carrying its burden of proof, the contractor must only prove that it could not have reasonably foreseen the cost overrun during the time of performance of the contract. The LOCC provides that notice is required when the contractor has reason to believe that the cost *"for the performance of this contract"* will be exceeded and to give a new estimate of costs required "for the performance of this contract." It is clear from this quoted language in the LOCC that the notice is to be given during the time of performance of the contract and therefore before performance is completed or the contract terminated. The LOCC affords the government an opportunity to stop work under the contract before the funds then obligated on the contract are exhausted. Here the agency terminated the contract on June 1, 1981. The requirement for a post-termination notice under the LOCC would be nugatory. The crux of the matter is whether RMI knew or should have known *prior to June 1, 1981,* the contract termination date, that there would be a total cost overrun at year-end.

In arriving at its conclusion that RMI "failed to prove the overrun in question was not reasonably foreseeable" the Board relied on information contained in RMI's financial data for the month ended May 29, 1981. It is apparent that the Board, both in its fact finding and in its conclusions drawn therefrom, experienced difficulty with the critical concept that even though financial data is deemed *currently available,* its availability has a time lag beyond the end of the particular accounting period. In addition, certain findings of fact do not track the accounting periods. For example, the Board made the following findings of fact:

20. The cost figures for April and May 1981 were available to appellant in May and June 1981, respectively (Reed affidavit). This record supports that this was appellant's usual accounting procedures, i.e., that current financial information was available to appellant throughout the contract....

. . . .

22. As of 1 May 1981, appellant states that it knew of a projected 4,503 hour overrun in the estimated total number of labor hours, and corresponding overruns of $170,127 and $159,348 in the individual cost elements of direct labor dollars and engineering overhead, respec-

tively ... This admission as to the size of the engineering overhead overrun is based on using the actual cumulative monthly rate for April, 1981 (see finding 19 above), i.e., $14.15 per hour (id.). Appellant also states, after taking into consideration anticipated, offsetting underruns primarily in Business Overhead, Direct Material, Material Overhead and G & A, that the "Total Estimated Actual Cost" as of 1 April 1981 was $3,885,487 (id.), i.e., $26,501 less than "estimated Cost" of the contract ($3,911,988) established by Modification P00012 (id.).

85–3 BCA ¶ 18,231 at 91,546.

The end of the April accounting period was 1 May 1981 (85–3 BCA ¶ 18,231 at 95,545), but there is no accounting period beginning or ending "as of 1 April 1981." Based upon these findings, the Board stated:

> Appellant has admitted that in April 1981 it anticipated direct labor hours, dollars and engineering overhead overruns of its estimates (findings 20, 22). Its principal argument, however, is that the expected overruns in these areas were more than offset by contemplated underruns in direct material, material overhead and G & A. Using April 1981 rates (most importantly the $14.15 engineering overhead rate), appellant argues that it had no reason to anticipate an overrun as of the end of April 1981.

85–3 BCA ¶ 18,231 at 91,546.

Although RMI states in its brief on appeal that there was an actual year-to-date cost underrun prior to termination of the contract and the government does not contradict this, the Board made no such finding of fact. It may well be implied in fact finding 22—the key being the mysterious "as of 1 April 1981" date—but due to the criticality of this fact to this case, it cannot be assumed. Further, the Board in arriving at its decision that the overrun was reasonably foreseeable by RMI relied in part on financial data for the month ended May 29, 1981.

The Board stated:

> Although not clarified in the record, the engineering over head reductions in

March-April 1981 were apparently attributable to the "partial reinstatement" of contracts 3KSES. Seemingly, *by May 1981*, any effect of the "partial reinstatement" had been offset (or eliminated) and the engineering overhead rate again was climbing to pre-April 1981 levels.

The Board continued:

> Appellant refers to the general finding in DCAA's audit report that appellant's accounting system "is acceptable for recording actual performance costs under cost type contracts." (Finding 12) From this, appellant seemingly argues that it had no reason to foresee the overrun due to the sufficiency of its accounting system. But as stated above, the point is not the adequacy or inadequacy of appellant's accounting system, but rather that appellant states it was currently aware of the information reflected in its financial statements *for April and May 1981*. This record gives every indication that availability of current information was the customary practice. Appellant here simply did not choose to use or realistically assess information reported by the system (and available to it prior to completion) and take into consideration the possibility that it might not be awarded the follow-on LCAC contract.

85–3 BCA ¶ 18,231 at 91,547 (emphasis added).

The above reliance by the Board on May 1981 data directly conflicts with its finding of fact 20 which found that this information was not available to RMI until June 1981, which was subsequent to the termination date of the contract. In addition, the Board's following statement is, at best, puzzling:

> Appellant's argument, however, ignores the real issue which is that during performance of the contract appellant reasonably should have known, or at the least had reason to believe, that a cost overrun would occur. This information *was available* to appellant *months* before termination of the contract and award of the follow on contract.

85–3 BCA ¶ 18,231 at 91,547 (emphasis added).

There is no support for this statement in the Board's findings of fact. It may well be that the April month-end information available in May would have put RMI on notice of a cost overrun. However, this information became available to RMI no more than weeks, not months, prior to the contract termination date of June 1, 1981.

 Since the decision is based upon inadequate findings of fact, conclusions not supported by findings of fact, and the inappropriate consideration of the effect of May month-end data on April month-end data, the decision cannot stand. It is arbitrary, capricious, and based on less than substantial evidence. This is one of those cases where it is apparent that the Board needed expert testimony for the proper analysis and interpretation of the accounting data. Accordingly, we vacate the Board's decision and remand the case for a hearing at which the Board can and should take additional evidence, particularly the testimony of experts in the accounting field.

VACATED AND REMANDED.