INTERNATIONAL SCIENCE AND
TECHNOLOGY INSTITUTE,
INC. Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 96–251 C.

United States Court of Federal Claims.

May 17, 2002.

Hilary S. Cairnie, Washington, DC, for plaintiff.

Opher Shweiki, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant, with whom were Robert E. Kirschman, Jr., Assistant Director; David M. Cohen, Director; and Stuart E. Schiffer, Deputy Assistant Attorney General. Stephanie Buser; John Scales; and Kevin O'Donnell, of counsel.

## OPINION

DAMICH, Chief Judge.

This case is before the Court on Defendant's motion for summary judgment and its renewed motion to dismiss Count V of the complaint and Plaintiff's cross-motion for summary judgment and renewed motion for partial summary judgment as to Count V of the complaint. For the reasons enumerated below, Defendant's motion for summary judgment and its renewed motion to dismiss Count V is GRANTED and Plaintiff's cross-motion for summary judgment and its renewed motion for partial summary judgment as to Count V is DENIED.

## I. Background

This case, transferred to this Court on September 5, 2001, involves a cost plus fixed-fee contract between Plaintiff International

Science and Technology Institute, Inc. ("ISTI") and the United States Agency for International Development ("USAID"). This five year contract (ANE–0354–C–00–8030–00) was awarded to ISTI on April 18, 1988, for providing support services to the Indonesian government in expanding its child survival programs. The initial contract estimated the cost of fulfilling the contract at $12,336,641. The fixed fee was set at $914,475. The initial total estimated cost plus fixed fee was $13,251,116. At the time the contract was signed, funds in the amount of $5,911,941 had been obligated to the contract for the payment of costs and fixed fee. However, during the period of contract performance, the amount of funds obligated to the contract changed over time.

### A. Structure of Reimbursement of Indirect Costs

The heart of this dispute involves the manner in which the Government reimburses (or in this case did not reimburse) ISTI's claims for reimbursement of indirect costs incurred under the contract. After the contract performance began, ISTI billed the Government on the contract approximately every three weeks. The sections of this contract which are relevant to the dispute are found in sections B.5, B.6, B.7, and B.8. Section B.5 of the contract sets out the overall budget of the project. Section B.5 states in relevant part:

> Without the prior written approval of the A.I.D. Project Officer (which must be retained by the Contractor for audit purposes, and a copy of which must be furnished to the Contracting Officer by the Contractor), the Contractor may not exceed the estimated dollar cost of any individual line item of cost shown below by more than 15 % of such line item, except for (a) indirect costs, which are governed by Part 6 of this Section B; and (b) salaries and wages, which may not be exceeded unless approved by the Contracting Officer.

Pl.'s Cross-mot. at App. 326.

Sections B.6, B.7, and B.8 are geared specifically toward the reimbursement of indi-

rect costs under the contract. Section B.6(a) states in relevant part:

> The United States dollar costs allowable under this contract shall be limited to reasonable, allocable, and necessary costs determined in accordance with the clauses of this contract entitled, "Allowable Cost and Payment[sic]" and "Fixed Fee." (FAR 52.21607[sic]) and "Payment" (AIDAR 752.7003. Alternates[sic] 70 and 71).

Pl.'s Cross-mot. at App. 329. The "Allowable Cost and Payment" clause of Federal Acquisition Regulation ("FAR") 52.216–07(e) requires the Government to reimburse a contractor at the agreed upon billing rates pending establishment of final indirect cost rates. 48 C.F.R. § 52.216–07(e). The clause further obligates the Government to negotiate with a contractor to establish final indirect cost rates in accordance with 48 C.F.R. § 42.7. 48 C.F.R. § 52.216–7(d).

Section B.7 of the contract establishes the indirect cost rates for fringe benefits, G & A expenses, and overhead (subdivided by costs incurred in the home office, field—U.S., and field—local labor.) Pl.'s Cross-mot. at. App. 329. In connection with these indirect cost rates, section B.7 further provided that "[p]ending establishment of revised provisional or final indirect cost rates for each of the contractor's accounting periods which apply to this contract, provisional payments on account of allowable indirect costs shall be made on the basis of the following negotiated provisional rate(s) applied to the base(s) which is (are) set forth below." *Id.*

Section B.8 of the contract provides the mechanism for reimbursement of indirect costs and a ceiling on indirect cost rates. This section contains several provisions relevant to this suit. First, the contractor is precluded from changing "his established method of classifying or allocating indirect costs without the prior written approval of the Contracting Officer." Pl.'s Cross-mot. at 330. Second, the ceiling rates are established. "Reimbursement for indirect costs shall be at final negotiated rates, but not in excess of the following ceiling rates. . . ." *Id.* Third, the Government is released from any obligation to reimburse for indirect costs above the ceiling rates. "The Government shall not be

obligated to pay any additional amount on account of indirect costs above the ceiling rates established herein." *Id.*

In previous contracts with the Government, ISTI had used a specific scheme for the payment of indirect costs that could be found in separate Negotiated Indirect Cost Reimbursement Agreements (NICRAs) as approved by USAID. Pl.'s Cross-mot. at App. 248. However, in the contract at issue, a markedly different scheme was adopted in section B.7 that used a different rate structure. The two rate structures differed insofar as the in section B.7 the overhead distribution base was subdivided into three rates whereas the NICRA rates for overhead were not subdivided. On December 14, 1988, modification 0002 was executed in which the indirect cost rates were changed in order to reflect the NICRA rates. Modification 0002 eliminated separate overhead rates for home office, field-local, and field-U.S. personnel. Pl's Cross-mot. at App. 316, 329. However, the ceiling rates in section B.8 did not reflect the distribution base of the NICRA rates. These rates included rates for fringe benefits, G & A, field local-overhead, field-US overhead, and home-office overhead. Pl.'s Cross-mot. at App. 330.

B. Limitation of Funds and Limitation of Costs Clauses

Section B.5 of the contract, which sets out the overall budget of the contract, provided that "FAR Clause 52.232–22 entitled 'Limitation of Funds' is applicable to this contract until the contract is fully funded, at which time FAR Clause 52.232–20 entitled 'Limitation of Cost' applies." Pl.'s Cross-mot. at App. 326. In addition, section B.3(b) of the contract also provided that "[t]he clause entitled, 'Limitation of Funds' applie[s] to the contract," and section I, which describes FAR clauses incorporated by reference into the contract, incorporated the Limitation of Funds ("LOF") clause and the Limitation of Costs ("LOC") clause. Pl.'s Cross-mot. at App. 325, 366.

The LOF/LOC clauses require a contractor to give the Contracting Officer notice in order to be eligible for reimbursement of costs in excess of the allotted funds or total estimated cost. The LOF clause provides as follows:

> The Contractor shall notify the Contracting Officer in writing whenever it has reason to believe that the costs it expects to incur under this contract in the next 60 days, when added to all costs previously incurred, will exceed 75 percent of (1) the total amount so far allotted to the contract by the Government... [t]he notice shall state the estimated amount of additional funds required to continue performance for the period specified in the [contract].

48 C.F.R. § 52.232–22(c).

> Similarly, the LOC clause states that:
>
> (b) The contractor shall notify the Contracting Officer in writing whenever it has reason to believe that—
>
> (1) The costs the contractor expects to incur under this contract in the next 60 days, when added to all costs previously incurred, will exceed 75 percent of the estimated cost specified in the [contract]; or
>
> (2) The total cost for the performance of this contract, exclusive of any fee, will be either greater or substantially less than had been previously estimated.
>
> (c) As part of the notification, the Contractor shall provide the Contracting Officer a revised estimate of the total cost of performing this contract.

48 C.F.R. § 52.232–20(b), (c).

Additionally, the LOF/LOC clauses states that the Government was not obligated to reimburse a contract for costs incurred beyond the funds allotted to the contract or the total estimated cost of the contract, unless the contracting officer provided written notification of an increase in the availability of funds or an increase in the total estimated cost. The LOF clause states in relevant part:

> (f) Except as required by other provisions of this contract, specifically citing and stated to be an exception to this clause—
>
> (1) The Government is not obligated to reimburse the Contractor for costs incurred in excess of the total amount allotted by the Government to this contract; and

(2) The Contractor is not obligated to continue performance under this contract... or otherwise incur costs in excess of (i) the amount then allotted to the contract by the Government... until the Contracting Officer notifies the Contractor in writing that the amount allotted by the Government has been increased and specifies an increased amount... allotted by the Government to this contract.

48 C.F.R. § 52.232–22(f).

The LOC contains a similar provision:

(d) Except as required by other provisions of this contract, specifically citing and stated to be an exception to this clause—

(1) The Government is not obligated to reimburse the Contractor for costs incurred in excess of (i) the estimated cost specified in the [contract]...; and

(2) The Contractor is not obligated to continue performance under this contract... or otherwise incur costs in excess of the estimated cost specified in the [contract], until the Contracting Officer (i) notifies the Contractor in writing that the estimated cost has been increased and (ii) provides a revised estimated total cost of performing this contract...

48 C.F.R. § 52.232–20(d).

Both the LOF/LOC clauses also state that "[n]o notice, communication, or representation in any form other than that specified [in the LOF and LOC clauses], or from any person other than the Contracting Officer," could affect either the amount allotted by the Government to the contract to the contract's estimated cost, and that "[i]n the absence of the specified notice, the Government is not obligated to reimburse the Contractor for any costs in excess" of the amount allotted by the Government to the contract or the contract's estimated cost. 48 C.F.R. §§ 52.232–20(e); 52.232–22(h).

C. Billing of Indirect Costs

In a letter dated February 20, 1991, Plaintiff sent a letter to the USAID contracting officer stating that

[i]n accordance with the Limitation of Funds Clause of the Federal Acquisition

Regulations, this is to notify you that expenditures under the referenced contract will exceed 75% of the obligated amount within the next 60 days....The total amount of funds actually paid through Voucher # 57 for the period through December 31, 1990 was $6,465,137. We have since submitted Vouchers # 58, 59, and 60 in the amount of $378,300, bringing the grand total of payments and billings to $6,843,467. Given the current rates of expenditures, the vouchers to be submitted within the next 60 days will exceed the 75% amount.

Pl.'s Cross-mot. at App. 369.

The letter, however, did not contain any estimated amount of additional funds required to continue performance.

Subsequently, on December 5, 1991, Plaintiff sent a letter to the USAID contracting officer which contained a budget analysis that provided the contracting officer with an estimate of funds going forward. Plaintiff sought an increase in indirect cost reimbursement on a retroactive basis in the amount of "$347,375.27 for recovery of Fringe, Overhead and G & A at the above NICRA rates for the period 7/1/90 thru 10/29/91. This amount is properly chargeable to the period prior to 10/25/91 and will be billed in a separate voucher once the contract amendment has been approved." Pl.'s Cross-mot. at App. 375. According to the itemized "amended contract budget" attached to the letter, adding $347,375.27 in additional indirect expenses would increase the total budget to $12,675,798, which was $573,318 less than the $13,251,116. in funds available to the project. *Id.* Thus, no written notice of any overruns in funding the contract or costs were included in this letter.

The contracting officer sent a letter to Plaintiff in response on December 17, 1991. In this response, the contracting officer stated that he was "unable to make a firm determination" as to whether its request for indirect cost reimbursement on a retroactive basis would be granted, but noted that "the amount exceeds the ceiling rates previously agreed to by ISTI as a term of the contract. Also, this amount could well be used to further the objectives of the project." Pl.'s

Cross-mot. at App. 380. However, the contracting officer stated that the "request would be treated as a separate issue from that of the current proposed amendment to the project and subsequent amendment to the contract." *Id.* Furthermore, the contracting officer also stated that "ISTI did accept the current ceiling rates stipulated as a term of the contract; there was no advance notice of overruns in these categories; and in the event these requested monies were provided to ISTI it could very well have a negative impact on the project." *Id.* at 381. Accordingly, the contracting officer requested Plaintiff "to furnish a more detailed budget analysis of indirect costs reimbursed to date which includes what amounts have been reimbursed at what rates by category and what ISTI is requesting in the way of retroactive payments by category and at what rates." *Id.*

Plaintiff responded to the contracting officer in a letter dated January 22, 1992. In the letter, Plaintiff included a spreadsheet which indicated the amount of unpaid indirect costs for fiscal year ending June 30, 1991 and for fiscal year 1992 to date which it sought reimbursement, its method of computation for those costs and the reasons for which it maintained that the retroactive reimbursement should be made. Pl's Cross-mot. at App. 382–98. It sought $774,762.47 in unpaid indirect costs. *Id.* at 398.

On February 27, 1992, Plaintiff transmitted Voucher # 80 and advised that obligated funds had been depleted and that the voucher exceeded the obligated funds then by $79,498.84. Pl.'s Cross-mot. at App. 399. The letter further requested written authorization by March 2, 1992, to continue performance on the contract. On March 2, 1992, the contracting officer responded with the following authorization to continue work: "I hereby authorize you to proceed with agreed upon activities planned under the current contract and incur associated expenses until the contract is amended to incorporate the revised scope of work, the revised budget and the increased obligated funds." Pl.'s Cross-mot. at App. 400.

The next day, March 3, 1992, Plaintiff submitted Voucher # 81 in the amount of $764,152.91 for "[r]ebilling for NICRA's [f]om Voucher # 1 to Voucher # 80." Pl.'s Cross-mot. at App. 401. As a result of this voucher, the billed amount would exceed the amount of funds obligated to the contract by $720,163.15, but that, with the additional funds in that voucher, $3,263,011 still remained in unobligated funds under the contract. Pl.'s Cross-mot. at App. 403. In a facsimile dated March 18, 1992, the contracting officer denied payment of Voucher # 81 on the grounds that Plaintiff's "voucher utilizes rates and applications of fringe benefits and indirect costs not agreed to nor budgeted for in the contract." Accordingly, the amount billed is not due to ISTI. Pl.'s Cross-mot. at App. 405.

On April 10, 1992, Plaintiff and USAID signed bilateral Modification 0004, which revised the indirect cost rates effective as of February 1992, but did not revise the indirect cost rates to apply the NICRA's fringe benefit rates retroactively as Plaintiff has requested. *Id.* at 296. Modification 0004 also increased the obligated funds available in the contract by $3,514,128, which was more than enough to cover the indirect costs requested by Plaintiff in Voucher # 81 had the contracting officer honored that voucher.

On April 27, 1992, Plaintiff submitted additional information on Plaintiff request for revising the indirect cost rates. On June 9, 1992, the contracting officer denied Plaintiff's request on the ground that

> ADIAR Handbook 14, Part 742, stipulates that any [NICRA] based on audit report shall not change any monetary ceiling, obligation, or specific cost allowance or disallowance provided for in the contracts to which the negotiated indirect rates are applicable. Your request for reimbursement will obviously change the contract funding and increase the amount obligation which were not provided nor budgeted in ISTI's subject contract.

Pl.'s Cross-mot. at App. 413.

On November 9, 1994. Plaintiff submitted a certified claim with the contracting officer seeking reimbursement for $925,507.21 in indirect costs and fee. This claim consisted of four elements: (a) alleged unreimbursed

fringe benefits of $ 543, 594.43; (b) alleged unreimbursed overhead of $174, 497.38; (c) alleged unreimbursed G & A of $177,617.56; and (d) alleged unpaid fixed fee of $29,797.84. Def.'s Mot. at App. 95–96. In its claim, Plaintiff argued that it was undercompensated because USAID misapplied the fringe benefit rate to a distribution base that was different from the one used to compute NICRA rates and that USAID was required to apply NICRA rates with respect to all contracting activities including evaluation of proposals and payment of vouchers. *Id.* at 96, 100. It also claimed that the ceiling rates for overhead, fringe benefits, and G & A were void *ab initio* because they were in conflict with NICRA rates and application bases. Plaintiff also argued that its billing for indirect costs in accordance with the rates established by the contract from April 18, 1988 through January 31, 1992 was a "mistak[e]." *Id,* at 110A.

The contracting officer, however, denied Plaintiff's claim in a letter dated June 14, 1995. In denying the claim, the contracting officer stated that FAR 42.703(c) provides that "Contracting Officers shall ... use final indirect cost rates of a business unit for a given period, which shall be binding for all the cost-reimbursement contract of the business unit for that period, subject to any specific limitation in a contract...." Def.'s Mot. at App. 118. The contracting officer then noted that NICRA applicable to the contract stated: "This agreement shall not change any monetary ceiling, obligation, or specific cost allowance or disallowance provided for in the Contracts or Grants listed below or any other agreements between the parties." *Id.* In addition, the contracting officer justified the application of the fringe benefit rate as found in sections B7., B.8 and modification 0004 of the contract because was a "specific limitation" which was not affected by the NICRA. *Id.* The contracting officer denied the Plaintiff's claims related to the monetary ceilings on the basis of (a) FAR 42.703(c) as discussed above; (b) the provision of NICRA which stated that NICRA does not change any monetary ceiling provided for in the contract; and (c) because section B.8 of the contract specifically stated that "[t]he government shall not be obligated

to pay any additional amount on account of indirect costs above the ceiling rates established herein." Def. Mot. at App. 119. Finally, in response to Plaintiff's assertion that its billing of indirect costs in accordance with the terms of the contract was a mistake, the contracting officer stated that Plaintiff had voluntarily agreed to the ceiling rates mutually agreed to by both parties and submitted billings in accordance with the terms of the contract for three years and seven months.

On July 28, 1995, the contracting officer confirmed that the June 14, 1995 letter was a final decision. In response, Plaintiff filed a complaint in this Court on May 3, 1996, which was subsequently amended on August 15, 1996.

## II. Standard for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS,* 998 F.2d 979 (Fed. Cir.1993). The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, this burden may be discharged if the moving party demonstrates that there is an absence of evidence to support the non-moving party's case. *Id.* ("[T]he burden on the moving party may be discharged by 'showing'—that is, point out to the district court—that there is an absence of evidence to support the non-moving party's case.") *Id.* If the moving party makes such a showing, the burden then shifts to the non-moving party to demonstrate that a genuine factual dispute exists. *Id.* at 322, 106 S.Ct. 2548. In order for a factual dispute to be genuine, the evidence must be such that a reasonable jury or trier of fact could return a verdict for the non-moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order for the non-moving party to demonstrate that a genuine factual dispute exists, by means of an opinion, it must produce a factual foundation in suffi-

cient detail in order for the Court to determine whether the opinion would support a verdict for the non-moving party, with all reasonable inferences drawn in favor of the non-movant. *Arthur A. Collins, Inc. v. Northern Telecom, Ltd.,* 216 F.3d 1042, 1047–48 (Fed.Cir.2000).

## III. Analysis

A. Plaintiff Did Not Comply With the Limitation of Funds/Limitation of Costs Clauses of the Federal Acquisitions Regulations.

As stated above, section B.5 of the contract specifically stated that "FAR Clause 52.232–22 entitled 'Limitation of Funds' is applicable to this contract until the contract is fully funded, at which time FAR clause 52.232–20 entitled 'Limitation of Cost' applies." Pl.'s Cross-mot. at App. 326. Because the contract was fully funded with the execution of modification 0004 on April 10, 1992, the LOC clause superceded the LOF clause on that date. Both clauses provide that the Government is not obligated to reimburse a contractor for any costs in excess of the total amount allotted by the Government to the contract or the contract's estimated cost "[i]n the absence of the specified notice. . . ." 48 C.F.R. § 52.232–20(e); 48 C.F.R. § 52.232–22(h). The LOF/LOC clauses both require the contractor to notify the contracting officer in writing whenever it has reason to believe that, within the next 60 days, the costs will exceed 75 percent of the estimated cost specified in the schedule and that the notice shall state the estimated amount of additional funds required to continue performance or a revised estimate of total cost of performance as the case may be. 48 C.F.R. § 52.232–20(b)(1), (c); 48 C.F.R. § 52.232–22(c). The estimated costs specified in the schedule "constitute a ceiling on the government's contractual liability." *Advanced Materials, Inc. v. Perry,* 108 F.3d 307, 310 (Fed. Cir.1997). The purpose of the LOF/LOC clause is, as stated by the U.S. Court of Appeals for the Federal Circuit, to:

protect both the contractor and the government. The ability to obtain government approval of additional costs before incurring them protects the contractor from discovering, after performing the contract at greater cost than anticipated, that its work has been financially disastrous because the government will not pay the additional costs. It also relieves the contractor, if such advance approval is not given, from its obligation to complete the contract or to incur costs in excess of the estimate. The limitation of the government's liability to the estimated cost stated in the contract (unless additional costs are authorized) protects the government from having to pay more than it had anticipated and set aside for the contract if the contractor's cost of performance exceed the estimate. It also give the government the choice whether to incur additional costs for the contract or to have the contract terminated. *It is therefore important that the requirements of the cost limitation provision be followed.*

The thrust of the cost limitation is prospective, *i.e.,* the parties are to determine their future course of dealing before the estimated cost has been exceeded and, if performance is to continue, to set the amount of the additional cost.

*Advanced Materials, Inc.,* 108 F.3d. at 310–11 (emphasis added).

■■■■ It is clear that Plaintiff never submitted a single piece of written correspondence that would satisfy, standing alone, the LOF/LOC clauses. Plaintiff's February 20, 1991, letter notified USAID that expenditures would exceed 75 percent of the obligated amount within the next 60 days, but it did not, as required by the LOF clause, provide USAID with the "estimated amount of additional funds to continue performance." Plaintiff's December 5, 1991, letter, in which it sought an additional $347,375.27 for recovery of indirect expenses, likewise did not provide written notification of the estimated amount of additional funds required to continue timely performance of the contract. Indeed, this notice did not suggest that any additional funds would be required at all to perform the contract because the letter stated that the total projected expenditures under the contract would be $12,675,798, which was less than the total estimated cost of $13,251,116. Pl.'s Cross-mot. at App. 371.

USAID's December 17, 1991, letter in reply to Plaintiff's December 5 letter does not in any way acknowledge that the contracting officer received sufficient notice to the contrary.

 Plaintiff's January 22, 1992, letter is the first notice to USAID that a cost overrun occurred. It also provides an estimated amount of additional funds required. However, this notice does not satisfy the LOF/LOC clause even though it states that it incurred over $ 744, 762.47 in cost overruns. The notice requirement under the LOC/LOF clause is, as stated above, prospective rather than retroactive. *Advanced Materials, Inc.*, 108 F.3d at 310. The cost overrun claimed by Plaintiff was ostensibly for costs that it incurred prior to the notice. Any notice of cost overruns that occur after the incurrence of the cost is untimely and defeats the purpose of the clause. For the same reason all subsequent notice of cost overruns, including Voucher # 81, submitted on March 3, 1992, cannot provide such notice either because ISTI had incurred over $720,163 in costs over the funds obligated to the contract.[1]

**B. Plaintiff Was Not Excused From Complying With The Limitation of Funds/Limitation of Costs Clauses.**

 According to *Johnson Controls World Services, Inc. v. United States*, 48 Fed.Cl. 479, 486–87 (2001), there are several circumstances in which a contractor may be excused from complying with the strict notice requirements of the LOF/LOC clauses. Plaintiff argues, following *Johnson Controls*, that it is excused from complying with the LOF/LOC clauses because (a) the Plaintiff could not have avoided the cost overrun by stopping work; (b) USAID was not prejudiced by the lack of adequate notice because it did not stop work; and (c) failure to reimburse the indirect costs would be inequitable because (i) the indirect costs requested are properly due under section B.7 of the contract as modified by modification 0002; (ii) USAID accepted the benefit of performance; (iii)

USAID treated Plaintiff unfairly; and (iv) USAID unduly delayed conducting audits of Plaintiff's indirect cost rates. Each argument will be addressed in turn.

**1. Plaintiff Cannot Show that It Could Have Avoided Incurrence of Indirect Costs Through Stoppage of Work.**

*Johnson Controls* teaches that the notice requirements of the LOF/LOC clauses do not apply when the contractor cannot avoid the incurrence of costs through stopping work.. *Johnson Controls World Services Inc.* 48 Fed.Cl. at 490 (citing *Dames & Moore*, 93–1 BCA ¶ 25,487 at 126,976, 1992 WL 310239). *See also RMI, Inc. v. United States*, 800 F.2d 246, 248 (Fed.Cir.1986) (quoting *General Elec. Co. v. United States*, 194 Ct.Cl. 678, 687–88, 440 F.2d 420) ("[I]f a 'contractor, through no fault or inadequacy on its part, has no reason to believe, during performance, that a cost overrun will occur and the sole ground for the contracting officer's refusal [to fund a cost overrun] is the contractor's failure to give proper notice of the overrun' the contractor is entitled to have the overrun funded."). In this case, Plaintiff argues that, unlike the incurrence of direct costs incurred during the performance of the contract such as labor, subcontractors, and so forth, it cannot stop incurrence of indirect costs that had already been incurred. For instance, Plaintiff argues that it had signed long-term leases and incurred a significant amount of overhead expenses. However, if Plaintiff wishes to demonstrate that it could not have stopped incurrence of the indirect costs, first, it must "discharge its burden of proving that the 'cost overrun was not reasonably foreseeable.'" *Johnson Controls World Services, Inc.*, 48 Fed.Cl. at 487 (quoting *RMI*, 800 F.2d at 248). "[T]he [LOC/LOF clauses] still contemplate[ ] that the contractor would notify the Government, if for example, it became aware during performance of the contract of potential cost overruns...." *Id.* at 490. Plaintiff offers no concrete evidence that it could not have foreseen the incurrence of all of these anticipated overruns of indirect costs

---

**1.** Accordingly, Plaintiff's alternate argument that the letters submitted from February 5, 1991 through January 22, 1992 together comprises sufficient notice for the purpose of the LOF/LOC clause likewise must fail because at no time did Plaintiff ever provide notice of estimated costs needed to complete the contract prior to the incurrence of cost overruns.

because it cannot do so. Plaintiff should have known that it would have incurred cost overruns in indirect expenses at the time it incurred expenses, such as long-term leases and salaries. Furthermore, unlike the situation in *Johnson Controls*, where incurrence of overruns of skyrocketing worker's compensation and liability costs were unforeseeable and unavoidable after the performance of the contract, *id.*, Plaintiff could have notified the contracting officer of the cost overruns at a sufficiently early time when at least some of these expenses could have been avoided. In the absence of any material evidence that the incurrence of indirect costs were unforeseeable, Plaintiff cannot be excused from failing to comply with the LOF/LOC clauses because it could not avoid cost overruns.

2. Plaintiff Cannot Prove that USAID was not Prejudiced by its Failure to Provide Notice of Cost Overrruns.

■ Non-binding case law suggests that failure to provide notice as required the LOC/LOF clause can be excused if failure to provide such notice did not prejudice the Government. *Johnson Controls World Services, Inc.*, 48 Fed.Cl. at 487 (citing *Dames & Moore*, 93–1 BCA ¶ 25,487 at 126,976, 1992 WL 310239 ("lack of advance notice is not a legitimate bar to funding an overrun if it is unlikely that the Government would have directed work to stop even if it had prior notice.")). Plaintiff argues that the Government was not prejudiced because at no time did it order that performance of the contract should be stopped. It also argues that the Government would not likely stop performance because the contract, which provided support services to the Government of Indonesia in its expansion of child survival programs, was of critical importance. However, as important as child survival programs is to the mission of USAID, it does not inevitably follow that USAID will pay for any cost overrun incurred or continue performance on the contract at any cost Nor does the fact that, in this instance, USAID ordered continued performance after it learned that Plaintiff incurred cost overrun necessarily mean that USAID would have continued performance if it learned of the likely cost overrun

prior to its incurrence. Had Plaintiff given USAID the requisite notice, it would have had the ability to choose between various steps to avoid cost overruns by altering the budget, imposing cost-cutting measures, stopping only a portion of contract performance, or terminating the contract for convenience. These options were precluded by the failure of Plaintiff to give the requisite notice. Instead, USAID was confronted with the cost overrun as an accomplished fact in which both Plaintiff's and USAID's options in dealing with the issue were severely limited. Assuming that lack of prejudice on the part of the Government excuses a contractor's failure to comply with the LOF/LOC clauses, Plaintiff has not demonstrated how the Government was not prejudiced by the failure to supply the notice required by the LOC/LOF clauses.

3. USAID Did Not Inequitably Refuse Payment of Plaintiff's Claim for Reimbursement of Indirect Costs.

■ Even if a contractor does not comply with the strict notice requirements of the LOF/LOC clauses, the clauses cannot serve as a bar to payment if "under all the circumstances, 'it would be inequitable for the Government to refuse additional funding.'" *Johnson Controls World Services, Inc.*, 48 Fed.Cl. at 487 (quoting *General Elec. Co. v. United States*, 194 Ct.Cl. 678, 684, 440 F.2d 420 (1971)). Plaintiff argues that it would be inequitable for the Government to deny reimbursement for several reasons. Each argument will be discussed in turn.

First, Plaintiff argues that the amount it requested in Voucher 81 reflects the NICRA indirect cost rates that were set forth in the amended section B.7 in modification 0002. Because section B.7, states that "provisional payments on account of allowable indirect costs shall be made on the basis of the following negotiated provisional rate(s) applied to the base(s) which is (are) set forth below," Plaintiff maintains that the Government is required by the terms of section B.7 to pay the allowable indirect costs submitted in Voucher # 81 on the basis of the negotiated NICRA rates. However, this argument does not take into account the ceiling rates

contained in section B.8. Section B.8 is entitled "Advance Understanding on Ceiling Indirect Cost Rates and Final Reimbursement For Indirect Costs." Pl.'s cross-mot. at App. 330. Section B.8(c)(3) provides that "[r]eimbursement for indirect cost shall be at final negotiated rates, but not in excess of the following ceiling rates." *Id.* Section B.8(c)(4) provides that "[t]he Government shall not be obligated to pay any additional amount on account of indirect costs above the ceiling rates established herein." *Id.* By agreeing to ceiling rates for indirect costs, in section B.8, Plaintiff explicitly agreed to the possibility that it would not be reimbursed for all of its indirect costs.

To avoid having the ceiling rates in section B.8 apply to the contract, Plaintiff maintains that the ceiling rates as established in section B.8 are invalid because the rates and distribution bases of the ceiling rates contained in section B.8 are different from the indirect cost rates as finally negotiated between the parties. At the outset of the contract, Section B.7 of the contract, entitled "Establishment of Indirect Cost Rates," expressly provided for allocation of fringe benefits in accordance with the following three-tier structure: (1) U.S. Home Office Staff—25 percent; (3) U.S. Field Staff—40 percent combined rate with overhead; and (3) Local Field Staff—30 percent combined rate with overhead. Pl.'s Cross-mot. at App. 329. Section B.8, entitled "Advance Understanding On Ceiling Indirect Cost Rates and Final Reimbursement For Indirect Costs" provided for reimbursement of fringe benefits as follows: (1) U.S. Home Office Staff—25 percent (through June 30, 1991); (2) U.S. Field Staff—44 percent combined rate with overhead; and (3) Local Field Staff—30 percent combined rate with overhead. *Id.* The indirect cost rates contained in Section B.7 were revised to conform with Plaintiff's NICRA rates. Pl.'s Cross-mot. at App. 318. However, the ceiling rates contained in section B.8 remained unchanged. Arguably, this difference is anomalous. While it is true, as Defendant points out, that the NICRA rates govern how indirect costs are allocated while ceiling rates, in part, determine whether the contractor is eligible for reimbursement of those rates, it is unclear to the Court exactly

what rationale exists for the distribution bases of the ceiling rates and the NICRA rates to differ. A possible explanation is that the parties simply neglected to change the ceiling rates accordingly. However, the mere fact that the parties neglected to change the ceiling rates to correspond to NICRA indirect cost rates that were added the contract is not a sufficient basis to invalidate an express provision of the contract. Moreover, the fact that section B.7 of the contract provides that the indirect cost rates are to be established in accordance with § 52.216–07 of the FAR which in turn holds that final rates "shall not change any monetary ceiling, contract obligation, or specific cost allowance or disallowance provided for in this contract," 48 C.F.R. § 52.216–07(d)(3), indicates that the parties explicitly intended the ceiling rates to govern the contract no matter what indirect cost rates would be finally be agreed to by the parties. Accordingly, Plaintiff has failed to demonstrate that the ceiling rates are invalid or otherwise unenforceable.

Next, Plaintiff argues that if the Court applies the strict notice requirements of the LOF/LOC clauses that the Government receives a windfall that it is not entitled to receive. This argument is meritless because anytime the LOF/LOC clauses bar a claim for cost overruns already incurred, the costs avoided by the Government could likewise be characterized as a windfall. If the Court were to accept Plaintiff's argument as a legitimate excuse for avoiding the application of the LOF/LOC clauses, it would be difficult to conceive of a scenario in which the clauses could ever bar a claim for reimbursement.

Next, Plaintiff argues that in its negotiations with the contracting officer was treated unfairly or given false hopes by the contracting officer that its request for retroactive reimbursement of indirect costs when the contracting officer decided to treat the overrun issue as a separate issue from all other issues in the administration of the contracts. As early as December 17, 1991, the contracting officer expressed reservations as to the merits of Plaintiff's request: "I am not optimistic that I can rule in ISTI's favor at this point." Nothing in the statements made by the contracting officer's correspondence dem-

onstrates inequitable conduct, nor can the Plaintiff point to any statement upon which it relied to its detriment.

Finally, Plaintiff argues that it could not project cost trends, including cost overruns, because USAID takes an inordinately long time to audit its indirect cost rate submissions. However, this Court need not decide whether USAID's audit process harmed the Plaintiff because, as this Court held earlier, Plaintiff cannot prove that its cost overruns were unforeseeable. Because Plaintiff had the ability to ascertain the amount of overhead costs that it had incurred—the Plaintiff's billing error notwithstanding—it cannot claim any prejudice for the failure of USAID to audit its indirect cost submissions in a timely fashion. *See Titan Corp., v. West,* 129 F.3d 1479 (Fed.Cir.1997).

Because the Plaintiff did not comply with the notice requirements of the LOF/LOC clause and has likewise failed to establish that its failure to furnish such notice must be excused, the Plaintiff's claim for reimbursement of retroactively incurred indirect costs is barred. Accordingly, the Court need not consider the parties further arguments as to whether the contracting officer abused its discretion in denying its request for reimbursement.

## C. Fixed–Fee Claim

The parties have renewed their dispositive motions with respect to Count V of the complaint in which Plaintiff claims that USAID breached the contract at issue by failing to pay the full amount of its fixed fee and sought $29,797.84 in unpaid fixed fee plus interest. Am. Compl. ¶¶ 100–01. After the complaint had been filed, Defendant sent to Plaintiff's counsel a check in the amount of $31,993.69. This amount reflected the full amount of the fixed fee sought by Plaintiff plus additional interest. A second check was later delivered to Plaintiff's counsel in the amount of $3,314.80 which represented additional interest due. Plaintiff claims that it is a "prevailing party" for the purposes of the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 4212(d), because it was paid its fixed fee claim in its entirety, but that not all interest has been paid. Defendant maintains that it has fully paid Plaintiff's fixed fee claim with interest and that, therefore, Plaintiff's claim is moot. Defendant also denies that Plaintiff is a prevailing party for the purposes of EAJA. At oral argument, Plaintiff represented that the purpose of its motion with respect to Count V was not to resolve whether all interest had been paid, but "to lock in our status as a prevailing party on that particular count and to preserve our position thereafter to file an EAJA application, and in that process would come to reconcile whatever interest variation there might be." March 26, 2002 Tr. at 5. The Court finds Plaintiff's proposal at oral argument to be a sensible manner of resolving these issues. The Court will accordingly dismiss Plaintiff's fixed fee claim as moot. The issues of whether Plaintiff is a prevailing party for the purposes of EAJA and whether all interest has been paid will be addressed if Plaintiff timely files an EAJA application with the Court.

## IV. Conclusion

Defendant's motion for summary judgment and its renewed motion to dismiss Count V is GRANTED and Plaintiff's cross-motion for summary judgment and its renewed motion for partial summary judgment as to count V is DENIED. The Clerk of the Court is directed to enter judgment in favor of the Defendant and dismiss Plaintiff's complaint.